

**PHILLIPS MURRAH** P.C.

*Attorneys and Counselors at Law*

May 23, 2022

*Via Digital Charge System*

Re:     *Charging Party: Renee Zinsky*
        *Respondents:  American Income Life Insurance Company*
                *Globe Life*
        *EEOC Charge Nos. 533-2022-00761 & 846-2022-08080*

Respondents American Income Life Insurance Company ("AIL") and Globe Life ("Globe Life")[1] (collectively, "Respondents") submit this statement of their position in response to the allegations in the above-referenced Charges filed by Renee Zinsky ("Charging Party").[2]  The Charging Party alleges sexual harassment, gender discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").  The Charging Party also filed a nearly identical Charge against Arias Agencies.[3]  As explained below, because the Charging Party was not an employee of AIL or

---

[1] It is unclear whether Globe Life Inc. ("Globe Life") or its subsidiary Globe Life And Accident Insurance Company ("GLAIC") was the intended Respondent in EEOC Charge No. 846-2022-080080, which is named "Renee Zinsky v. GLOBE LIFE."  Regardless, as set forth below, *neither* is a proper Respondent in this inquiry.  The Charging Party's allegations arise from her position as a separately-licensed and independent contractor sales agent who contracted with Respondent AIL, but we are unaware that the Charging Party had similar contracts or performed work for either Globe Life or GLAIC.

Nor would she.  Globe Life Inc. is a parent holding company for certain insurance subsidiaries that offer insurance products (such as AIL or GLAIC), but Globe Life Inc. itself does not offer insurance products and therefore does not contract with independent sales agents.  While AIL and GLAIC do offer different insurance products and do contract with independent sales agents, the Charging Party only appears to have contracted with AIL and had no relationship with the separate subsidiary GLAIC to our present knowledge.  Therefore, this Position Statement focuses on the Charging Party's allegations as to AIL, and any "Globe" entity can and should be dismissed absent more evidence.

[2] This statement is based upon facts known to Respondents AIL and Globe Life as of the date of the statement based on and is subject to supplementation as additional facts become available or in the event the Charging Party provides further information or specifics relating to her charges.

Respondents are providing this information, which it considers to be confidential, with the understanding that the EEOC will maintain it in confidence, use it exclusively in its investigation of the above Charges, and not disclose to anyone outside the Commission without Respondents' express written consent.  This disclosure of information to the Commission is for purposes of its investigatory proceedings and is not and should not be considered a waiver of the attorney-client privilege or work-product privilege, which Respondents maintain.

[3] Charge No. 533-2022-00573.

ZINSKY0017937

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 2

Globe Life, she cannot maintain the claims in her Charges against AIL or Globe Life and the
Commission must issue a no-cause determination as to both Respondents.

## A.    Background on Respondents

AIL is one of the nation's largest creators and providers of supplemental life, health, and
accident insurance products to labor unions, credit unions, and associations. AIL covers more than
2 million policyholders and has served working class families since 1951 with life, accident, and
supplemental health products to help protect members of labor unions, credit unions, associations,
and their families.

AIL's products are sold to consumers through <u>independent contractor sales agents that play
no role in the creation or underwriting of AIL's insurance products</u>. Rather, sales agents engage
in the distinct business of insurance sales, are independent contractors that own and operate their
own businesses, and are separately licensed by each state in which the agents choose to conduct
business.[4] The indisputable fact that sales agents are separately-licensed independent contractors
has been uniformly confirmed by:

- The Charging Party herself, who admits her "1099 independent contractor" status
  in the Charge;

- The relevant contracts and documents, including her signed Agent Contract and
  Special Acknowledgment expressly stating that she was an independent contractor
  and not an employee;

- Numerous federal courts that have <u>repeatedly</u> ruled that sales agents who contract
  with AIL specifically—and in the insurance industry generally—are independent
  contractors <u>as a matter of law</u> and, therefore, not subject to Title VII (*see* Section E
  *infra*); and

- Other regulators such as the IRS and state workforce agencies, who have
  consistently acknowledged that AIL owes no employment obligations for its
  independent contractor sales agents.

AIL contracts with these independent contractor sales agents in a tiered system: the
highest-level agent contract is a state general agent ("SGA"); with lower tiers such as a regional
general agent ("RGA") or a master general agent ("MGA"); and finally, a basic sales agent. All
sales agents at every tier, including the highest-level SGA, are independent contractors. Sales
agents are usually affiliated with a particular SGA, but AIL does not control with whom sales
agents choose to affiliate.

---

[4] Sales agents operating in Pennsylvania must be licensed by Pennsylvania to sell insurance. The costs associated
with obtaining a license are paid by the prospective agent. A sales agent cannot lawfully sell insurance in Pennsylvania
without a license, and obtaining a license is a prerequisite to contract with an insurance company such as AIL. To
obtain a license, sales agents undergo a rigorous course of study and must pass a licensing exam specific to the type
of insurance they wish to sell.

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 3

Simon Arias is a separately-licensed and independent contractor sales agent at the SGA level.[5]  Like all SGAs, he independently owns and operates his own business with whom lower-tier agents can choose to affiliate for support of their own businesses.[6]  Simon Arias' business is named Arias Agencies, is represented by separate counsel in this proceeding, and has submitted its own Position Statement confirming that (a) AIL is not a parent company of the independent Arias Agencies; and (b) although the Charging Party chose to associate with Arias Agencies, she was an independent contractor and not an employee.  Michael Russin was an independent contractor sales agent classified as either an RGA or MGA (depending on the relevant time period) who also chose to affiliate with Arias Agencies.

The fact that sales agents at every level operate as independent contractors—and not employees—is evident from the express language of the Agent Contract that any sales agent must enter before selling any AIL insurance products.  In addition to the clear explanation of the independent contractor relationship in the Agent Contracts, sales agents also sign a one-page Special Notice Acknowledgment that similarly emphasizes the sales agent's independent contractor status and that the sales agent is not an employee of AIL.  Either party may terminate the agreement without cause (although thirty days' notice must be given).

Other than entering Agent Contracts that authorize sales agents to sell AIL insurance products, AIL has virtually no contact with sales agents below the SGA level.  Rather, sales agents interact directly with other agents affiliated with the SGAs with whom they have chosen to affiliate.  AIL does not control or direct the sales agents' manner of work upon contracting.  Sales agents have control over which potential customers they contact, and whether or how many potential customers to contact.  While a basic agent may receive leads from agents at higher tiers, they are not required to use those leads and can sell AIL's products to anyone, including customers to whom they are referred by others.  Among other things, independent contractor sales agents have no fixed hours, can work from any location, and are free to choose the time and manner in which services are performed.  The independent contractor sales agents are responsible for bearing all business expenses and what expenses to incur and the amounts of those expenses are up to the individual sales agent to decide.

Sales agents receive commissions and bonuses based on their own policy sales and on sales made by lower-tier agents who affiliate with them.  AIL issues IRS 1099 forms for these payments.  AIL does not withhold payroll taxes for its independent contractor agents, who are responsible for their own taxes and able to claim business expense deductions that could not be claimed by an employee.  The amount of income that sales agents generate through their sales commissions depends on the amount of time they choose to devote to their independent business, their skills as a licensed insurance professional, and their ability to manage their time and resources effectively and efficiently.  Whether an independent contractor sales agent earns a profit or suffers a loss depends on whether the individual sales agent is successful in earning commissions that outpace their own business expenses.

---

[5] The Charging Party inaccurately refers to Mr. Arias as AIL's "CEO."  (Charge No. 533-2022-00761).

[6] The Charging Party inaccurately states that "AIL is a parent company of Arias Agencies."  (Charge No. 533-2022-00573).

ZINSKY001795

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 4

Although EEOC Charge No. 846-2022-080080 also references "Globe Life" as a Respondent, it is unclear whether that refers to parent company Globe Life Inc. ("Globe Life") or a different corporate entity like Globe Life And Accident Insurance Company ("GLAIC"). To the extent the Charging Party states that "AIL is a wholly-owned subsidiary of Globe Life" (see January 24, 2022 Charge), that refers to Globe Life *Inc.* which is the parent holding company for insurance subsidiaries like AIL. But Globe Life Inc. does not offer insurance products, does not contract with sales agents, and had no contractual relationship with the Charging Party to our present knowledge.[7]

## B.   The Charging Party's Independent Contractor Relationship with AIL

In early 2019, the Charging Party contracted with AIL as an independent contractor agent, affiliated with Arias Agencies. <u>Exhibit 1</u>. Pursuant to her Agent Contract, she received commissions based on premiums from business produced by the Charging Party.

As the Charging Party acknowledges in her Charge, she was at all times an <u>independent contractor</u>, not employee, of AIL. This admission is consistent with her Agent Contract, which expressly states:

**RELATIONSHIP**

The Agent is an independent contractor to the fullest extent permitted by law, and will not be treated as an employee with respect to services performed under this Contract for Federal and State tax purposes. The Agent has no fixed hours and is free to choose the time and manner in which services are performed. The Agent shall not represent or imply that the Agent is an officer of the Company or a person having general authority to transact business for the Company. As an independent contractor, the Agent is not eligible for unemployment benefits or worker's compensation.

<u>Exhibit 1 at 4</u>. She also signed the Special Notice Acknowledgement attached as Exhibit A to the Agent Contract, which reiterates for the avoidance of doubt: "I understand that I will not be an employee of the Company; rather, I will be an independent contractor for the Company." <u>Exhibit 1, Exhibit A</u>. The Charging Party signed the contract below this language.

As set forth in the Charging Party's Agent Contract, AIL does not provide her with office space or basic administrative support. Likewise, her Agent Contract makes clear that AIL does not control or direct the manner in which the Charging Party performs her work and AIL has no involvement in decisions regarding agent promotions or demotions. AIL has not withheld payroll taxes for the Charging Party, she has been paid solely by commission based on sales, and AIL issues IRS 1099 forms for these payments.

**At no time has the Charging Party been an employee of AIL. The facts and documents make clear that at all times she was and remains an independent contractor.**

---

[7] To the extent "Globe Life" refers to GLAIC, that is a separate insurance subsidiary under Globe Life Inc.—which offers its own insurance products—but GLAIC also had no contractual relationship with the Charging Party to our present knowledge. Regardless of which entity was the intended Respondent "Globe Life," neither appears to be a proper Respondent because neither is known to have any contractual relationship with the Charging Party.

ZINSKY001796

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 5

**C.     The Charging Party Has No Relationship with Any Globe Entity**

The Charging Party has no legal or contractual relationship with any Globe entity.  The Agent Contract the Charging Party executed is with AIL, not any Globe entity.  Insurance applications written by the Charging Party are submitted to AIL for processing and AIL issues IRS 1099 forms for the Charging Party's commission payments—not any Globe entity.  And the Charging Party has pointed to no facts supporting any relationship with either Globe Life Inc. or GLAIC, because there are none.  Rather, it appears that her Charge against "Globe Life" rests on the sole fact that AIL is a "subsidiary" of Globe Life Inc., which is insufficient as a matter of law.

**The facts and documents make clear that at no time has the Charging Party been an employee *or* an independent contractor of any Globe entity.**

**D.     Anti-Sexual Harassment Policies and Reporting Avenues for Independent Contractors**

Contrary to the allegations in the Charging Party's Charges, there are multiple avenues available for reporting sexual harassment concerns, and the Charging Party was provided with this information.

In connection with her contract with AIL, the Charging Party elected membership in the *Office and Professional Employees International Union* (*OPEIU*) Local 277 (the "OPEIU"), which accepts independent contractor insurance agents who choose to contract with AIL.  Indeed, OPEIU recognizes that sales agents are independent contractors, expressly stating that AIL and sales agents do not have "the relationship of employer and employee"; that sales agents "may exercise their own judgment as to the time and manner of performing services"; and that sales agents "in the performance of activities shall be acting on the agent's [] own behalf and not as an employee."  OPEIU also has its own anti-harassment policy and procedure for these independent contractor members, and advise those who feel they have been subjected to or have witnessed sexual harassment to "immediately report such occurrence to [their] supervisor, office manager, the State General Agent, or if [they] prefer, to Tyler Turner, OPEIU 277 President and Senior Business Representative," and provides Mr. Turner's email address and phone number.  Exhibit 2.

Further, AIL's Social Media and Digital Asset Policy For Independent Contractors—which all sales agents including the Charging Party acknowledge and signed—prohibits harmful, rude, discriminatory, harassing, abusive, demeaning, or threatening social media communications.  Exhibit 3 at 2.  This policy "requests and strongly urges independent contractors to report any violations, perceived violations, or possible violations" to AIL via a provided email address.  *Id.* at 3.[8]

---

[8] Though the Charging Party had no affiliation, either as an employee or independent contractor, with Globe Life, Globe Life has robust policies prohibiting discrimination, harassment, and retaliation by and against employees and independent contractors.  Exhibit 4 at 7-10.

ZINSKY001797

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 6

**E.    The Charging Party's Association with Arias Agencies and August 2021 Complaint to Arias Agencies**

When she associated with Arias Agencies in early 2019, the Charging Party was new to the insurance industry.  When entry-level agents enter their first Agent Contract and begin selling insurance products (sometimes called "coding"), they often associate with higher-level agents in a commission structure who may provide support and sales advice for the entry-level agents.  In the case of the Charging Party, her Agent Contract notes that she chose to affiliate with Arias Agencies as the SGA; Thomas Vena as the RGA; Michael Russin as the MGA; and Samuel Boyle as the GA.

On information and belief, in or about August 2021, the Charging Party met with Simon Arias and raised concerns about Mr. Russin's conduct and use of certain language, and asked Mr. Arias to recode her from Mr. Russin to Mr. Arias, which it is Respondents' understanding that Mr. Arias immediately did.  Further, on information and belief, the Charging Party requested to be changed from Supervising Agent to Agent at that time because she found leadership too stressful and wanted to focus on her own production.[9]  In addition, and according to Mr. Arias, the Charging Party did not want him to terminate the contractor relationship with Mr. Russin and asked only to be recoded from Mr. Russin.  However, based on information learned by Respondents at a later date, Arias Agencies went ahead and issued Mr. Russin an Agent Written Notice of Disciplinary Action based on the Charging Party's allegations, noting that it was a final warning and that any additional improper conduct would result in immediate termination of his contract with Arias.  According to Mr. Arias and his assistant, at no time did the Charging Party follow up with them regarding her complaint or make any further allegations regarding Mr. Russin.

To Respondents' knowledge, the Charging Party has also never indicated to Respondents that she reported any harassment or other objectionable conduct (by Mr. Russin or anyone else) to Mr. Turner, the OPEIU President and Senior Business Representative.

**F.    The Charging Party's Later Complaint to AIL, AIL's Immediate Investigation, and AIL's Termination of Mr. Russin's Contract**

In November 2021, and for the first time, the Charging Party emailed AIL that she had some things she would like to discuss.  Exhibit 5.  An AIL representative contacted the Charging Party by phone the same day.  During that call, the Charging Party alleged that Mr. Russin was sexually and verbally harassing her.  **Before the call, AIL was unaware of the Charging Party's prior allegations or that she had met with Mr. Arias about Mr. Russin in August 2021.**

At AIL's request, the Charging Party later sent a written statement detailing her allegations.  Exhibit 6.  In that statement, the Charging Party alleges that Mr. Russin:

- is dishonest, "flirtatious," and has "perused [sic] quite a few different women on the team";

---

[9] The Charging Party later confirmed to AIL that her change from Supervising Agent to Agent in 2021 "made sense," because she (by choice) was no longer supervising any agents.

ZINSKY001798

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 7

- said "appalling things" to his wife in text messages;
- sent the Charging Party a Snapchat message referencing oral sex;
- sends "aggressive GroupMe messages" and creates a "beyond Toxic environment."

She adds in her statement, cutting against any claim that she is an employee of AIL or Globe Life: **"Mind you, we are 1099."** *Id.*

Upon receipt of the Charging Party's complaint, AIL immediately launched an independent investigation into her allegations.  The investigation lasted many weeks and included review of all materials submitted by the Charging Party and ten interviews, including two of the Charging Party, which her attorney attended, and interviews of Mr. Arias, Mr. Russin, and multiple current and former colleagues of Mr. Russin and the Charging Party.[10]

Based on the investigation, AIL terminated Mr. Russin's contract with AIL.

**E.     The Charging Party's Allegations Against Globe Life and AIL are Without Merit**

Before AIL completed its investigation, the Charging Party filed with the EEOC verbatim charges against Arias Agencies, Globe Life, and AIL alleging sexual harassment, gender discrimination, and retaliation in violation of Title VII and the PHRA.  For the reasons set forth below, none of the Charging Party's claims against Globe Life or AIL has merit.

**First, and fatally, at no time has the Charging Party been an employee of either AIL or Globe Life, thus all her claims against AIL and Globe Life under Title VII and the PHRA fail.**  The facts and documents make clear—***and the Charging Party acknowledges***—that she is an independent contractor of AIL (and had no contractual relationship of any sort with Globe Life).[11]  As the EEOC's own guidance explains, Title VII's protections apply only to *employees*. *See* https://www.eeoc.gov/employers/coverage-0 ("[p]eople who are not employed by the employer, such as independent contractors, are not covered by anti-discrimination laws."); *see also Pavlik v. Int'l Excess Agency, Inc.*, 417 F. App'x 163, 167 (3d Cir. 2011) ("Title VII does not cover independent contractors").  Further, with limited exceptions not applicable here,[12] courts interpret claims under PHRA coextensively with Title VII claims. *See Alcantara v. Aerotek, Inc.*, 765 F. App'x 692, 696 n.8 (3d Cir. 2019) (claims that fail under Title VII also fail under the PHRA).  Thus, the Charging Party cannot maintain her Title VII and PHRA claims against AIL or Globe Life.  Any argument by the Charging Party that she was an employee of either AIL or Globe

---

[10] During her interviews, the Charging Party added multiple additional allegations about Mr. Russin. However, at no time during the Charging Party's discussions with AIL or her interviews in connection with AIL's investigation did she raise the allegations she now raises in her Charges that women were not promoted at Arias Agencies or that "other males in leadership positions…have engaged in sexual harassment, affairs, and other inappropriate physical, verbal, and sexual conduct with female coworkers."

[11] In her Charges the Charging Party states: "I am a 1099 independent contractor."

[12] *See* 43 PA. Stat. Ann. § 954(x) (independent contractors who hold positions/occupations subject to regulations enforced by Bureau of Professional and Occupational Affairs or included in Fair Housing Act are covered by PHRA, neither of which include/regulate the insurance industry or insurance agents).

ZINSKY001799

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 8

Life would fail, as the facts and circumstances support only one conclusion: <u>she was never an employee of either</u>.

This conclusion is supported by well-established and extensive case law. Insurance sales agents—even more so than many other groups of independent contractors—enjoy a distinctively flexible and independent business model. Courts have *repeatedly* found that sales agents contracted **with AIL** are independent contractors, not employees, as a matter of law. Moreover these courts have applied this indisputable independent contractor status to prohibit attempts to assert claims **under Title VII**. *See Pajor-Flores v. Am. Income Life Ins. Co.*, No. 16-CV-01992-CMA-KMT, 2017 WL 6033689, at *5 (D. Colo. Oct. 31, 2017) (granting summary judgment on Title VII claim because sales agent was an independent contractor); *Shaw v. Am. Income Life Ins. Co.*, No. 1:11-CV-123, 2012 WL 400703, at *13 (N.D. Ind. Feb. 7, 2012) (holding that sales agent "was an independent contractor of AIL" for Title VII purposes); *Hovanski v. Am. Income Life Ins*. Co., No. 2:03-CV-0838-VEH, 2006 WL 8436890, at *12 (N.D. Ala. Jan. 11, 2006) ("Since Plaintiff is an independent contractor, she is not protected by Title VII and her federal discrimination claims fail as a matter of law. Title VII only applies to employees and does not apply to independent contractors."); *Ratigan v. Am. Income Life Ins. Co.*, No. CIV. 98-1288-AS, 1999 WL 446079, at *1 (D. Or. June 24, 1999) (AIL "was not Plaintiff's 'employer' [because she was an independent contractor] and therefore [it was] not liable for discrimination under Title VII"). These decisions are consistent with the right to control analysis in multiple jurisdictions, including in the Third Circuit. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 180 (3d Cir. 2009) (holding worker was independent contractor, not an "employee," and thus, not entitled to protection from employment discrimination under Title VII); *Kravis v. Karr Barth Assocs.*, No. Civ. A. 09-485, 2010 WL 337646, at *5 (E.D. Pa. Jan. 26, 2010) (holding insurance sales agent is an independent contractor and thus the Title VII claims fail). This is a threshold legal barrier that the Charging Party cannot overcome, and it requires a no-cause determination as a matter of law.

**Second, there is no evidence, and the Charging Party references none, that either Globe Life or AIL was responsible for any of the conduct the Charging Party alleges.** Decisions about demotions or promotions were not made by Globe Life or AIL (which the Charging Party effectively admits in her Charges).[13] AIL was completely unaware of the Charging Party's concerns about Mr. Russin until November 2021, at which time it immediately launched an independent investigation. Further, contrary to the Charging Party's allegations that AIL "concealed" policies prohibiting sexual harassment or avenues to report sexual harassment, the documents reflect that she was made aware of such policies, which include multiple avenues to report harassment. And the evidence establishes that the Charging Party was well aware of how to raise concerns, which she did with Arias Agencies and only later with AIL.

**Third, AIL went above and beyond any legal obligation by (1) conducting a prompt and very thorough investigation into the Charging Party's complaint, and (2) taking prompt,**

---

[13] Further, to the extent the Charging Party's discrimination claim regarding the failure to promote her is based on conduct that occurred more than 300 days before her January 22, 2022 Charge, such a claim is untimely and must be dismissed. *See Ryan v. Gen. Mach. Prod.*, 277 F. Supp. 2d 585, 591 (E.D. Pa. 2003) (dismissing failure to promote claim as time-barred under Title VII and PHRA).

ZINSKY001800

Charge Nos. 533-2022-00761 & 846-2022-08080
May 23, 2022
Page 9

**remedial action by terminating Mr. Russin's contract with AIL upon conclusion of the independent investigation.**

F.     **Conclusion**

Because the Charging Party was never an employee of AIL or Globe Life, she cannot maintain the claims in her charge against either Respondent.  Regardless, even if she could maintain such claims against AIL, it took prompt remedial action to address the conduct at issue by terminating Mr. Russin's independent contractor contract upon conclusion of its investigation. Further, to the extent the Charging Party's failure to promote claim is based on events more than 300 days before her Charges, such claim is time-barred.  Thus, AIL and Globe Life respectfully request that the Commission conclude its investigation and issue a no-cause determination on these Charges.  We appreciate your courtesy and consideration.

Very truly yours,

Kathryn D. Terry

Kathryn D. Terry

Attachments

ZINSKY001801

# EXHIBIT 1

ZINSKY001802

# PRE-CONTRACTING ACKNOWLEDGEMENT
# AND CERTIFICATION

I, RENEE M ZINSKY , hereby swear and acknowledge that I have been fully informed of the following:

1.      No staff members, management personnel or independently contracted American Income Life Insurance Company (AIL) insurance agent made any representations regarding the level of income that I can expect to receive. I certify that I fully understand that my only income will be received through the commissions that I may receive through the sale of insurance policies.

2.      I certify that I have been specifically informed that I will receive no reimbursement for expenses that I incur while engaging in the business of selling insurance policies. Specifically, I understand that I will not be reimbursed for mileage, gasoline, vehicle maintenance, cellular telephone charges, long distance telephone charges, sales materials, Internet or any office supplies.

3.      I understand that I will earn income only on a commission basis, and I will not earn commissions until I have completed the training process to become proficient in selling insurance.

4.      In the event that I do not sell any insurance policies or have difficulties meeting my personal sales goals, I understand that I have the option and am encouraged to seek the assistance from those independent agents that are in the hierarchy listed in the Agent Contract that I executed. I understand that the individuals listed in said hierarchy will assist me with exploring alternatives to attempt to improve my sales performance and achieve my personal income goals.

5.      I certify and affirm that I have been fully informed by AIL representatives that being an independently contracted insurance agent subjects me to market fluctuations and that there is no guarantee or assurances that I will earn commissions to meet my personal financial requirements. This is a risk that I acknowledge and am knowingly undertaking. Based on this acknowledgement, I understand that I will NOT be eligible for Unemployment Compensation benefits should my contract as an independent agent with AIL be terminated for any reason.

Signed:                                                        Date:

_____                02/13/2019
                                                               _____

# EXHIBIT 1

ZINSKY001804



# American Income Life Insurance Company

Executive Office: P.O. Box 2608, Waco, Texas 76702 (254) 761-6400

## AGENT CONTRACT (the "Contract")

### OBLIGATIONS OF AGENT

The Agent agrees:

(a) To use all business records, policyholder records, as well as records of leads, prospects or memberships of organizations, only for the business purposes of American Income Life Insurance Company (the "Company"); to hold such records in confidence, and to comply with any and all applicable privacy laws regarding such records; to recognize that such records are the property of the Company whether paid for or created by the efforts of the Company, the State General Agent, the Agent, or any other person; and to surrender such records to the Company upon request without retaining copies.

(b) To submit all applications for life, accident, and health insurance secured by the Agent promptly to the Company, and to no other entity or person.

(c) While an Agent of the Company and for two (2) years thereafter, not to attempt to induce representatives of the Company to end their respective relationships with the Company, or to breach their respective contracts with the Company, or to encourage and/or assist anyone else taking such actions.

(d) While an Agent of the Company and for two (2) years thereafter, not to attempt to induce the Company's policyholders to terminate their respective policies with the Company.

(e) Never to make any statement that is injurious or harmful to the Company, its business or its reputation.

(f) Not to be licensed with, or maintain a contract or appointment with, any insurance company other than a member of the Torchmark Corporation group of companies while contracted with the Company.

(g) To repay upon demand all sums owing on the account of the Agent to the Company, any one or more of the Torchmark Corporation group of companies and/or to any State General Agent.

(h) To obey and comply with any laws, rules or regulations of any Federal, State or local government and/or any other entity having jurisdiction over the sale or service of insurance.

(i) To maintain all appropriate licenses and appointments to engage in selling insurance products under this Contract, including compliance with applicable continuing education requirements.

(j) Never to advertise or communicate to applicants, policyholders, insureds or any other person any information that is deceptive, misleading, unlawful and/or untruthful, and/or that constitutes a misrepresentation of fact or an omission of a material fact, and/or that is otherwise not in compliance with requirements of any governmental authority(ies).

(k) To advise the Company of any investigations, claims or demands made by any regulatory authority(ies) against the Agent arising directly or indirectly from her or his actions under this Contract.

(l) To protect any lead sheets or customer information of existing and/or potential customers of the Company as confidential; to safeguard such information at all times; and not to use such information for any purpose other than the business of the Company.

(m) To notify the Company of any discipline, suspension or termination with respect the Agent's license in any State where the Agent is appointed to sell the Company's products within 72 hours of such action.

### LIMITATION OF AUTHORITY

The Agent does not have authority to:

(a) Obligate the Company, except by the terms of the insurance application.

(b) Alter the terms of any policy or contract of the Company.

(c) Collect premiums for life, accident and health insurance policies other than in the name of the Company.

(d) Use advertising and/or other materials, regardless of medium, referencing the Company's products other than that which is provided or approved by the Company.

(e) Enter into agreements in the Company's name for debts, expenses or other liabilities, including, but not limited to, lease agreements.

(f) Endorse or cash checks made payable to the Company

ZINSKY001805

## EXPENSES

The Agent shall be responsible for all expenses incurred in the production of insurance for the Company. The Agent shall, at her or his own expense, furnish her or his own: means of transportation; office or place of business; advertising materials, form letters, letterheads, and any other relevant items used in the solicitation of insurance for the Company. Any persons retained by the Agent to assist the Agent in the solicitation or sale of insurance shall be at the Agent's own expense.

The Agent shall be responsible to the Company for all loss and/or damage arising in any way from business done by and entrusted to her or him and shall indemnify, hold harmless, save and defend the Company from any and all expenses, costs, causes of action, losses or damages, including attorney's fees, incurred by the Company as a result of any acts or omissions of the Agent, including unauthorized acts, fraud, or any breach of this Contract.

In the event the Company engages counsel for a breach by the Agent of the obligations of this Contract or otherwise in respect of any and all other violations of the law, whether seeking injunctive relief or damages, the Company shall be entitled to recover its reasonable attorneys' fees and any cost or expense incurred by the Company including flight expenses, arbitrator costs, expert witness fees, court reporter fees, transcript fees, travel expenses including hotels and meals of necessary witnesses and counsel and copy costs, all of which shall be treated as an element of damage to the Company relating to Agent's breach of this Contract and shall be awardable to the Company.

## ADVICE AND ASSISTANCE FROM OTHER AGENTS

Experienced agents, including Supervising Agents, General Agents, Master General Agents, Regional General Agents and State General Agents, are available to assist the Agent with sales advice, and may recommend strategies to the Agent that could help the Agent become a more successful salesperson. Additionally, from time-to-time, optional training and/or sales meetings may be held by the State General Agent with whom the Agent is affiliated in order to acquaint the Agent with new products, discuss sales techniques, exchange ideas with other agents, and provide general sales support and motivation. The State General Agent may request that the Agent voluntarily provide information about her or his sales activities in order to help identify agents who could benefit from additional training or sales assistance.

## COMMISSIONS

The commission for a given policy sold by the Agent is determined by the schedule in effect at the time the policy is issued and is subject to the following terms and conditions:

(1) Commissions will be paid on premiums received by the Company for business produced by the Agent less any premiums returned to the Company unpaid or refunded to the insured. A commission is not earned unless and until premium is received by the Company. No commissions will be paid on premiums that are waived, or on extra premiums for hazards or physical conditions. Recognizing that the amount of the Agent's profit or loss is solely dependent upon the Agent's degree of skill and effort, commissions paid to the Agent are to be in full satisfaction of all claims upon the Company account for services or expenses under this Contract.

(2) Subject to the terms of this Contract, including, but not limited to, paragraphs 3 and 4, below, commissions earned after termination of this Contract will be paid to the Agent only if: (a) the Agent's termination was not for cause; and (b) the Agent complies with all obligations under this Contract that arise following termination, including, but not limited to, the return of Confidential Information and the non-competition provisions herein.

(3) As set forth above, commissions are not earned by the Agent unless and until premiums are received by the Company. Solely for the benefit of the Agent, the Company may, at its sole discretion, pay the Agent commissions before they are earned (which commissions are referred to herein as "Advance Commissions"). The Company reserves the right to set limits on the amount of Advance Commissions and to charge interest and fees on Advance Commissions. Advance Commissions will be repaid by the Agent from the proceeds of commissions earned by the Agent following the Company's payment of the Advance Commissions. The Agent understands and agrees, however, that she or he shall be required to repay these Advance Commissions even if the commissions earned by the Agent are not sufficient to repay the Company the full amount of the Advance Commissions, and even if the Company fails to make a demand for repayment of the Advance Commissions. The Agent further agrees to the following additional terms as a condition of her or his receipt of Advance Commissions:

  (a)  Advance Commissions will be tracked on the Agent's account by the Company;

  (b)  The Company may reduce or withhold entirely any commissions otherwise payable to the Agent until the Advance Commissions are fully repaid by the Agent, including, but not limited to, renewal commissions that have vested pursuant to this Contract;

  (c)  The Agent understands and agrees that she or he is fully liable to the Company until the Advance Commissions are repaid in full and further understands and agrees that the Company's right to recover such Advance Commissions if they are not fully repaid is based on the Company's right of recoupment and are not in the nature of a set-off, since all such unpaid sums arise under this Contract; and

  (d)  After termination of this Contract, with or without cause, any Advance Commissions that have not been fully repaid will be immediately repaid by the Agent.

(4) The Agent shall not be entitled to receive renewal commissions until one (1) year after the effective date of this Contract. Thereafter the Agent's right to receive renewal commissions shall vest in accordance with the Company's union agreement with OPEIU Local 277.

The Agent's right to receive vested renewal commissions, if any, shall immediately terminate without notice if: (a) all Advance Commissions have not been fully repaid; (b) this Contract is terminated for cause or due to the Agent's violation of any provision of this Contract; and/or (c) in any calendar year following termination of this Contract the amount of such vested renewal commissions paid under this Contract is less than $150 (One Hundred and Fifty Dollars) per calendar quarter.

At the option of the Company, payment of commissions may be held in abeyance for one hundred and eighty (180) days after termination of this Contract in order to determine the existence of any sums owed to the Company or any other Torchmark Corporation affiliate, which sums are to be recouped from commissions. If the Agent has a credit balance on an account with any Torchmark Corporation affiliate, the credit balance may be applied to satisfy any sums owed by the Agent to said affiliate(s).

ZINSKY001806

This Contract has the standard commission schedule (AGSTD) unless otherwise indicated. Commissions earned after the termination of this Contract shall be credited in accordance with the union agreement with OPEIU Local 277.

## CONFIDENTIAL INFORMATION

The Agent understands and agrees that during the course of her or his performance of the obligations under this Contract, certain confidential and proprietary information relating to the Company's policyholders, business and operations will be made available to the Agent (which information is referred to herein as "Confidential Information"). The Agent agrees that she or he will not use this Confidential Information except in connection with the performance of her or his duties hereunder. The Agent further agrees not to disclose this Confidential Information to anyone other than employees of the Agent who have a need to know it, and to take all necessary and reasonable action to insure and cause all such persons to protect the confidentiality of such Confidential Information and to insure compliance with the confidentiality obligations herein. Such Confidential Information includes, but is not limited to, any and all business information such as: (a) methods, techniques, practices, marketing and sales information, financial data, plans and all other know-how and trade secrets of the Company which have not been published or disclosed to the general public; (b) the Company's business methods and practices, including pricing methods, contract terms, commissions, bonus schedules and practices; (c) compilations of data or information, including policyholder information, the Company's customer lists, lead lists and potential customer lists, CAS database information, and Impact application information; and (d) any other information not generally known to the public, including, but not limited to, information about the Company's policyholders, agents and agent contracts, hierarchies, operations, personnel, products, and trademarks or services, which, if misused or disclosed, could adversely affect the Company's business and/or provide a comparative advantage to anyone using such Confidential Information.

The Agent understands and agrees that the obligations of this section survive termination of this Contract.

IMMUNITY NOTICE:  18 U.S.C. § 1833(b) states: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Accordingly, the Agent has the right to disclose in confidence trade secrets to Federal, State or local government officials, or to an attorney, for the sole purpose of reporting or participating in the investigation of a suspected violation of law. The Agent also has the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Contract is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833 (b).

## USE OF THE COMPANY'S TRADEMARKS AND COPYRIGHTED MATERIALS

The Company hereby provides to the Agent a non-exclusive, non-transferable and non-assignable license to use the trademarks owned by the Company (the "Marks") solely in connection with the sale and promotion of the Company's insurance products during the term of this Contract. The Agent acknowledges the Company's ownership of the Marks and will fully comply with the quality standards and advertising approval procedures provided by the Company. All goodwill in the use of the Marks by the Agent shall inure solely to the benefit of the Company. The Company further hereby provides to the Agent a non-exclusive, non-transferable and non-assignable license to use the Company's copyrighted material (the "Copyrighted Material") solely in connection with the sale and promotion of the Company's insurance products.  The Agent's use of the Marks and Copyrighted Material will at all times comply with applicable law.

Upon termination of this Contract for any reason, the Agent will cease using the Marks and Copyrighted Material.  Further, the Agent will remove all references to the Marks and Copyrighted Material from any business signage, websites, domain names and/or domain name extensions and social media posts and return to the Company any publications, promotional items and advertising media using the Marks and/or Copyrighted Material.

## TERM AND TERMINATION OF CONTRACT

Either party may terminate this Contract immediately for cause, including non-performance of any material provision, or if the other party violates any applicable law, insurance code, or regulation. In addition, either party may terminate this Contract without cause by giving thirty (30) days' written notice. Any notice of termination of this Contract sent by the Agent to the Company shall be sent to: American Income Life Insurance Company; 1200 Wooded Acres Drive; Waco, Texas 76710; Attention: Agency Department. Notice of termination of this Contract, if sent by the Company to the Agent, is effective if mailed to the last address for the agent known by the Company's Senior Vice President of Agency, or if emailed to the Agent at the Agent's last known email address on file with the Company.

If the State General Agent to which the Agent is coded terminates its relationship with the Agent because the Agent has violated any applicable law, insurance code, or regulation, then this Contract will terminate immediately. If the State General Agent to which the Agent is coded terminates its relationship with the Agent for any other reason by giving the Agent thirty (30) days of written notice of same, then this Contract will terminate at the end of that thirty (30) days.

This Contract shall terminate automatically if the Agent's license(s) to sell insurance in the State(s) where the Agent sells the Company's products is/are terminated, suspended or revoked, or if the Agent otherwise fails to maintain such license(s).

After termination of this Contract, the Agent will never use the Company's Confidential Information, trade secrets including policyholder records, Company-provided union or credit union membership records, union membership lists, association sales procedures, mailing lists (union, credit union or association members), group insurance lists (unions, credit unions, or associations) or other of the Company's business records (such as lead return cards, referrals, policyholder lists, CAS database information, Impact application information, computer disks or other storage media, no matter how or when obtained, and whether prepared by the Company or the State General Agent or any other person) for any purpose, including, without limitation, for the purpose of soliciting the sale of insurance policies of the type offered for sale by the Company (e.g., life insurance policies, accidental death and dismemberment policies, cancer insurance policies and disability insurance policies) and/or for the purpose of replacing any insurance policy sold by the Company. Immediately upon termination of this Contract, all such records shall be returned by the Agent via overnight courier, signature required, to the address then on file with the Department of Insurance at the time in the state where the State General Agent's office is located. All such records will be returned immediately as provided herein without the Agent retaining any copies.  In the event the records are returned to Agent as undeliverable, Agent is responsible to immediately return such records via overnight courier, signature required, to American Income Life Insurance Company, Attention: Agency Department, 1200 Wooded Acres Dr., Waco, Texas 76710.

*3 AIL - US Agent Contract 01/2019*

ZINSKY001807

Agent agrees that in the event of a breach of this Contract, in respect of the Confidential Information/Trade Secrets, that an award of damages alone will not adequately compensate the Company and that immediate and irreparable injury will result and that Company has no adequate remedy at law such that Agent agrees that in addition to Company's right of action for damages, Company shall also be entitled to injunctive relief for any violation of this section.

## NON-COMPETITION

For a period of two (2) years after termination of this Contract, the Agent shall not:

(a)  Directly or indirectly contact the Company's policyholders to attempt to induce them to terminate their respective policies or in any other way to injure the business or reputation of the Company.

(b)  Attempt to induce representatives of the Company to end their respective relationships with the Company, or to violate the terms or conditions of their respective contracts with the Company.

Agent agrees that in the event of a breach of this Contract, that an award of damages alone will not adequately compensate the Company and that immediate and irreparable injury will result and that Company has no adequate remedy at law such that Agent agrees that in addition to the Company's right of action for damages, Company shall also be entitled to injunctive relief for any violation of this section.

## SEVERABILITY

If any provision of this Contract should be determined to be invalid or otherwise unenforceable under law, the remainder of this Contract shall not be affected thereby.

## DEPORTMENT

The Agent shall immediately forfeit her or his right to receive any commissions due or to become due under this Contract or any other agreement with the Company if the Agent at any time, either before or after termination of this Contract: (1) wrongfully withholds any funds belonging to any applicant for insurance, a policyholder, or the Company; (2) induces any policyholder to lapse, relinquish or surrender a policy with the Company; (3) engages in any conduct which constitutes a misappropriation of the Company's trade secrets or confidential information; or (4) in any other way breaches this Contract during its tenure or subsequent to its termination (including, but not limited to, a violation of those provisions of this Contract that survive the termination of this Contract).

## ARBITRATION

In the event of any dispute or disagreement, whether arising out of or relating to this Contract or otherwise, that is not subject to or resolved by the grievance process set forth in the operative union agreement between the Company's State General Agents, the Company, and OPEIU Local 277, the Parties to the dispute shall use their best efforts to settle such disputes. "Parties" includes the Agent, the Company (including its parent, Torchmark Corporation) and the State General Agent. To this effect, the Parties shall negotiate with each other in good faith to reach a just solution. The negotiation process is to be considered a settlement negotiation for the purpose of all state and federal rules protecting statements made during such conferences from later discovery or use in evidence.

If the Parties do not reach a just solution by negotiation as described above, then upon written notice by one Party to another, all disputes, claims, questions and controversies of any kind or nature arising out of or relating to this Contract, any alleged violation of any state or federal statute, regulation, law or order of any kind, and/or the agent's relationship as an independent contractor and not an employee (including, without limitation, claims for wrongful termination, discrimination, wage-and-hour violations, or any other claim based on an alleged employment relationship), regardless of whether they are brought by or against the Company, the Agent, or the State General Agent, except a dispute relating to the enforceability of this agreement to arbitrate, shall be submitted to binding arbitration under the substantive rules of the Federal Arbitration Act ("FAA"), to be administered by the American Arbitration Association ("AAA") in accordance with its Commercial Rules then in effect. The arbitration shall take place in the AAA office closest to the domicile of the Agent. The Company shall pay any AAA filing, administrative, and arbitrator fee(s). Arbitration shall be on an individual, not a class, collective, representative, or private attorney general basis. If this class-action waiver is deemed unenforceable, the entire agreement to arbitrate shall not apply. The arbitrator shall have the power to award any relief that would otherwise be available in court, including damages, pre-judgment interest and attorney's fees, if permitted by this contract or by statute, and injunctive or other equitable relief. The arbitrator's findings and award shall be final and binding on the Parties and their beneficiaries, successors, assigns, or anyone claiming an interest in the Contract. Any court having jurisdiction may enter judgment on the award rendered by the arbitrator(s). Jurisdiction and venue for an action brought by any Party as to the arbitrability of a dispute under this Contract shall exist solely in the state or federal courts located in McLennan County, Texas.  Any action brought to confirm or challenge an award rendered by an Arbitrator(s) shall be brought exclusively in the state or federal court of McLennan County, Texas.  The parties acknowledge that this Contract involves interstate commerce, and all issues relating to arbitration or the enforceability of this agreement to arbitrate shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* Aside from issues relating to arbitration or the enforceability of this agreement to arbitrate, all issues relating to any dispute, claim, or controversy arising out of or relating to this Contract shall be governed by and decided in accordance with the internal laws of the State of Texas, without regard to its choice-of-law rules.

## RELATIONSHIP

The Agent is an independent contractor to the fullest extent permitted by law, and will not be treated as an employee with respect to services performed under this Contract for Federal and State tax purposes. The Agent has no fixed hours and is free to choose the time and manner in which services are performed. The Agent shall not represent or imply that the Agent is an officer of the Company or a person having general authority to transact business for the Company. As an independent contractor, the Agent is not eligible for unemployment benefits or worker's compensation.

## PROTECTED HEALTH INFORMATION

The Agent understands and agrees that while performing her or his obligations under this Contract, she or he may receive information about individuals or entities who apply for or purchase the Company's insurance, which information is defined as "Protected Health Information" under the privacy

ZINSKY001808

regulations issued under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and/or "Nonpublic Personal Information" under the Gramm-Leach-Bliley Act ("GLBA") and its implementing regulations (collectively, this information is herein referred to as "Protected Information" or "PI"). The Agent agrees that she or he will at all times comply with the Company's policies regarding the treatment of such PI (hereinafter "Company Policies"). If the Agent becomes aware of any use or disclosure of PI that is not permitted by the Company's Policies and/or HIPAA and/or the GLBA, the Agent shall immediately report such incident to the Company and cooperate fully with the Company to fulfill any resulting legal obligations. The Agent understands and agrees that the obligations contained herein survive termination of this Contract.

### NO WAIVER

No provision of this Contract shall be waived nor any rule or procedure of the Company become inapplicable merely because the Company has failed to enforce it previously.

### ENTIRE AGREEMENT

This Contract, the Special Notice Acknowledgment attached hereto as Exhibit A, and the applicable commission schedules represent the entire understanding of the parties with respect to the subject matter hereof and supersedes and terminates any prior or contemporaneous agreements, whether written or oral, in which the Agent and the Company are parties except as described in this paragraph. This Contract can only be amended in a writing executed by Company and Agent.  Notwithstanding the execution of any subsequent, contracts between Company  and Agent in the event the Agent's commission schedule changes and she or he remains an Agent of the Company, policies previously issued under the then existing commission structure then in effect under the prior agent contract at the time of the issuance of any policy of insurance issued by Company shall remain and any new policy of insurance issued by the Company after the effective date of any subsequent agent contract will have the commission payable to the Agent by the Company based on the commission schedule then in effect at the time of issuance of the policy of insurance.

### NONASSIGNABLE

No benefit or right under this Contract may be assigned without the consent of the Company.

### REQUIREMENT OF WRITING

All agreements must be in writing. No promise or understanding shall be enforceable unless made in writing.

I HEREBY ACKNOWLEDGE THAT I HAVE READ THE FOREGOING CONTRACT IN ITS ENTIRETY, INCLUDING THE ARBITRATION PROVISION, THE SPECIAL NOTICE ACKNOWLEDGEMENT ATTACHED HERETO AS EXHIBIT A, AND AGREE TO ALL CONTRACT TERMS.

THIS CONTRACT SHALL NOT BECOME EFFECTIVE UNLESS AND UNTIL THE COMPANY SIGNS BELOW.

This Contract is signed *(Date)* 02/13/2019

*(Agent Printed Name)* RENEE M ZINSKY

*(Agent Signature Name)*

*(State General Agent Printed Name)* ARIAS SIMON A

*(State General Agent Signature Name)*

By *(Proxy Printed Name)*

By *(Proxy Signature Name)*

### AMERICAN INCOME LIFE INSURANCE COMPANY

This Contract is effective *(Date)*

By *(Printed Name)*

By *(Signature Name)*

5 AIL - US Agent Contract 01/2019

ZINSKY001809

| COMMISSION SCHEDULE INSTRUCTIONS | | |
|---|---|---|
| ▉ 50% Career Agent | ____ 67.5% Career Agent | ____ 77.5% Career Agent |
| ____ 60% Standard Career Agent | ____ 70% Career Agent | ____ 80% Career Agent |
| ____ 62.5% Career Agent | ____ 72.5% Career Agent | ____ 90% Career Agent |
| ____ 65% Career Agent | ____ 75% Career Agent | ____ 100% Career Agent |

**\*\*Career Agent automatic contract progression is outlined in the OPEIU Local 227 Agent/PR collective agreement**

ZINSKY001810

| HIERARCHY INSTRUCTIONS (please print) | | |
|---|---|---|
| Level | Contract Percent | Name |
| SGA | | ARIAS SIMON A |
| RGA | | THOMAS VENA |
| MGA | | MICHAEL RUSSIN |
| GA | | SAMUEL BOYLE |
| | | |
| | | |
| | | |
| AGENT | 50.00% | RENEE ZINSKY |

ZINSKY001811

## SPECIAL NOTICE ACKNOWLEDGEMENT
### EXHIBIT A

I understand and acknowledge the following:

1.  Checks of a policyholder or applicant must be made payable to American Income Life Insurance Company (the "Company") and never to me.

2.  I may not cash or deposit any check made payable to the Company.

3.  I may not contract for any purchase in the name of the Company.

4.  I may not sign any lease or incur any obligation in the name of the Company.

5.  I understand that I will not be an employee of the Company; rather, I will be an independent contractor for the Company.

6.  I will be paid on a commission basis only and I will receive a Form 1099 for the commissions that I am paid. The Company will not withhold taxes or social security from my commission payments. I am responsible for paying all of my own taxes, including social security payments.

7.  I am not eligible for unemployment benefits or worker's compensation.

8.  I am responsible for maintaining any separate office(s) in which I work, and I must furnish my own equipment, materials, and supplies (other than State- and/or Company-approved forms). I will incur and be responsible for the expenses related to my work, and expect to have recurring business liabilities and obligations. At my sole discretion and expense, I can hire one or more assistants to work for my business. I recognize that neither the Company nor the State General Agent will reimburse me for any expenses I incur in doing my business. Because the success or failure of my business will depend on the relationship of my business receipts (commission income) to expenditures, I may realize a profit or suffer a loss under my written contract(s) to perform services for the Company.

9.  I alone will control the manner and means of my work. I will set my own work schedule, and I will be free to choose the manner in which my work is performed. I understand that I am free to pursue other non-insurance-related business ventures while contracted with the Company.

10. I understand that from time to time, the Company or the State General Agent may make available to me training and/or sales meetings to introduce new products, offer assistance in maximizing my sales, and provide information regarding compliance with federal or state law pertaining to the sale of insurance.

11. I understand that my State General Agent may make sales leads available to me. However, I further understand that I have no right or guarantee to receive any leads at all. I understand that I am responsible for generating my own leads and/or referrals for potential customers.

12. I understand that the Company maintains the ultimate right to approve or disapprove any application and/or potential customer. I will be responsible for the satisfactory completion of the services for which I am contracted, and I will be liable for failure to satisfactorily complete the services. I will be responsible to the Company for all loss or damage arising from business done by and entrusted to me and I shall indemnify and hold harmless the Company from any and all expenses, costs, causes of action, loss or damages resulting from any fraudulent or unauthorized acts or omissions.

13. I will maintain the proper insurance license required to do business and will adhere to all state and federal laws and regulations applicable to insurance sales activity. I understand all customer leads and policyholder records are Company trade secrets, and are considered confidential and private and will not use them for anything other than Company business.

14. I will adhere to all State, Federal, and/or Provincial laws regarding privacy of consumer and/or policyholder records. I will take all appropriate and necessary steps to protect and safeguard the privacy and confidentiality of consumer and/or policyholder data to which I have access, regardless of the source of such data. I will comply with Company guidelines and contract requirements respecting the maintenance, return, and destruction of consumer- and policyholder-related records, including, but not limited to, business records, policyholder records, CAS records, lead records, and records concerning prospects or organization memberships.

Signature X _____     Date (mm/dd/yy) 02/13/2019 _____

ZINSKY001812

# PRE-CONTRACTING ACKNOWLEDGEMENT
# AND CERTIFICATION

I, RENEE M ZINSKY                    , hereby swear and acknowledge that I have been fully
informed of the following:

1.     No staff members, management personnel or independently contracted
American Income Life Insurance Company (AIL) insurance agent made any
representations regarding the level of income that I can expect to receive. I certify that I
fully understand that my only income will be received through the commissions that I
may receive through the sale of insurance policies.

2.     I certify that I have been specifically informed that I will receive no reimbursement
for expenses that I incur while engaging in the business of selling insurance policies.
Specifically, I understand that I will not be reimbursed for mileage, gasoline, vehicle
maintenance, cellular telephone charges, long distance telephone charges, sales
materials, Internet or any office supplies.

3.     I understand that I will earn income only on a commission basis, and I will not
earn commissions until I have completed the training process to become proficient in
selling insurance.

4.     In the event that I do not sell any insurance policies or have difficulties meeting
my personal sales goals, I understand that I have the option and am encouraged to
seek the assistance from those independent agents that are in the hierarchy listed in the
Agent Contract that I executed. I understand that the individuals listed in said hierarchy
will assist me with exploring alternatives to attempt to improve my sales performance
and achieve my personal income goals.

5.     I certify and affirm that I have been fully informed by AIL representatives that
being an independently contracted insurance agent subjects me to market fluctuations
and that there is no guarantee or assurances that I will earn commissions to meet my
personal financial requirements. This is a risk that I acknowledge and am knowingly
undertaking. Based on this acknowledgement, I understand that I will NOT be eligible
for Unemployment Compensation benefits should my contract as an independent agent
with AIL be terminated for any reason.

Signed:                                                    Date:

_____                    02/13/2019
                                                    _____

ZINSKY00181313

# EXHIBIT 2

ZINSKY001814

## OPEIU 277
## SEXUAL HARASSMENT POLICY AND PROCEDURE

Sexual harassment is unlawful discrimination. It violates the law and will not be tolerated. Agents, State General Agents or others who are affiliated with or conduct business with American Income Life may have their relations with the company severed if they commit acts of sexual harassment.

Sexual harassment includes making sexual activity a condition or requirement of a person's work, whether this is done directly or indirectly. It also includes any unwelcome sexual advances, offensive teasing or jokes, intimidation, humiliation, sexually suggestive comments or pictures, or unwelcome touching, or a hostile work environment. "Unwelcome" means when you know or should know that a person will find the conduct to be undesirable or offensive. It certainly includes when the person says or indicates through his or her actions that the conduct is undesirable. "Stop" means stop and "no" means no.

This policy is in effect at all times and in all places where agents or others who are affiliated with American Income Life are present or where American Income Life's business is being conducted.

If you feel that you have been subjected to or have observed an act of sexual harassment, you should immediately report such occurrence to your supervisor, office manager, the State General Agent, or if you would prefer, to Tyler Turner, OPEIU Local 277 President and Senior Business Representative at tyler@opeiu277.org or (817) 246-4981.  A prompt investigation will be conducted. Efforts will be made to preserve as much confidentiality as can be achieved under the circumstances. You will be protected from any retaliation or adverse action based on any report you make in good faith.

If it is determined that sexual harassment has occurred, appropriate steps will be taken to end the harassment, provide appropriate assistance or counseling to the victim, prevent the misconduct from recurring and impose appropriate disciplinary or other action against the perpetrator.

ZINSKY001815

# EXHIBIT 3

ZINSKY001816

**Torchmark Corporation Family of Companies**

**Social Media and Digital Asset Policy Summary**
**For Independent Contractors**

We understand as an independent contractor with **American Income Life Insurance Company** and **National Income Life Insurance Company** you may be eager to identify yourself as a part of the American Income Life and National Income Life organization online and on Social Media. Doing so, can be a positive way to connect with customers and potential recruits. The Social Media and Digital Policy are here to serve as a guide to ensure there is no confusion or misrepresentation of American Income Life.

- As an Agent, you must identify yourself with your name when posting on the internet. You are not a Company spokesperson; therefore you must make clear that you are speaking for yourself. You can use wording like *"The postings on this site are my own and do not necessarily represent the position, strategy or opinions of my workplace."*
- You are personally responsible for the content you publish online. Use common sense and remember that the internet never forgets and never deletes. When unsure please contact our Social Media department for guidance.
- Do not comment on customer related matters or internal organizational matters related to your Agency online.
- Never use racial slurs, personal insults, or obscenities.
- Give proper consideration for others' privacy and most definitely for topics that are considered objectionable or inflammatory, such as religion and politics.
- Think about the possible consequences of your posting. It could result in lost sales, negative personal and Company reputation issues, and even legal consequences.
- Never give out personal information about customers or other associates of the Company.
- Make sure you are always honest and accurate when posting information online. If you make a mistake, correct it quickly.
- You are unauthorized to use the Company's trademarked names and logos online unless you have been granted permission by the Company. You must adhere to all to "Advertising Guidelines" when using the Company's marks.
- The Company's logos may not be altered in any way.
- Any violations or perceived violations of the Social Media and Digital Policy should be reported to socialmedia@torchmarkcorp.com.
- The Company will investigate and respond to all reports of violations of this Policy.

**I acknowledge and agree to the Torchmark Corporation Family of Companies' Social Media and Digital Policy.**

RENEE M ZINSKY                                              02/13/2019
_____          _____
**Printed Name**                                              **Date**

*Renee Zinsky*
_____
**Signature**

ZINSKY001817

**Torchmark Corporation Family of Companies**

**Social Media and Digital Asset Policy**
**For Independent Contractors**

Torchmark Corporation and its affiliate companies (American Income Life Insurance Company, National Income Life Insurance Company, Globe Life And Accident Insurance Company, Liberty National Life Insurance Company, United American Insurance Company, First United American Life Insurance Company, and Family Heritage Life Insurance Company) (individually and collectively, the "Company") take no position on your individual decision to start or maintain a blog or participate in other social media activities. However, it is the right and duty of the Company to protect itself from unauthorized disclosure of information, and to safeguard its reputation and brands. The Social Media and Digital Asset Policy of Torchmark Corporation and its affiliates (the "Policy") includes guidelines for Company-authorized social networking, personal social networking, and local digital content. Please also see the Company's Social Media Guidelines and Social Media Etiquette.

**General Provisions**
"Social Media Communication" includes blogging, video postings, Wiki postings, Facebook, Twitter, LinkedIn, Flickr, Google+, Tumblr, Pinterest, Snapchat, Instagram, chat rooms, online journals, diaries, personal newsletters, etc.

Unless specifically authorized, independent contractors are restricted from speaking on behalf of Torchmark Corporation or any of its affiliates. Independent contractors may not publicly disclose, by way of Social Media Communication or otherwise, nonpublic information regarding the Company's consumers, customers, products, employees or independent contractors. Independent contractors are expected to protect the Company's privacy, as well as the privacy of its employees, independent contractors, consumers, and customers, and they are prohibited from disclosing personal, proprietary and nonpublic information to which they may have access.

**Monitoring of Electronic Facilities**
Independent contractors are cautioned that they should have no expectation of privacy using the Internet. Independent contractor postings can be reviewed by anyone, including other independent contractors, consumers, customers and others associated with the Company. Torchmark Corporation and its affiliates reserve the right to monitor and review comments or discussions about the Company, its employees and independent contractors, consumers, customers and the industry, including products and competitors, posted on the Internet by anyone, including its independent contractors.

**Confidential Information**
Pursuant to their respective contracts, the Company's independent contractors are obligated to maintain the confidentiality of trade secrets and private or confidential information of the Company and/or its consumers, customers, business associates, employees, independent contractors and/or others who are associated with or work on behalf of the Company. This may include information regarding the development of systems, processes, products, know-how and technology. Do not post internal reports, policies, procedures or other internal business-related confidential communications. Notwithstanding anything to the contrary herein, you may be entitled to immunity and protection from retaliation under the Defend Trade Secrets Act of 2016

ZINSKY001818

for disclosing a trade secret under certain limited circumstances, as set forth in the Torchmark
Corporation Code of Business Conduct and Ethics as adopted by the various Torchmark
Corporation affiliates.

## Be Honest and Accurate

Make sure you are always honest and accurate when posting information or news in your Social
Media Communication, and if you make a mistake, correct it quickly. Be open about any
previous posts you have altered. Remember that the Internet archives almost everything;
therefore, even deleted postings can be searched. Never post derogatory comments or rumors
about the Company, past or present employees, other independent contractors, members,
consumers, customers, business associates and/or other people associated with or working on
behalf of the Company.

## Avoid Harmful or Rude Behaviors

Independent contractors should refrain from rudeness or unprofessional behavior toward a
consumer or customer, or anyone who is in contact with the Company. Independent contractors
should not be discourteous or disrespectful to a consumer or customer or any member of the
public while representing the Company. Each independent contractor is expected to work in a
cooperative manner with consumers, customers, Company personnel, other independent
contractors, and others associated with or working on behalf of the Company.

## Comments About the Company

Do not create a link from your blog, website or other social networking site to the Company's
website(s) without identifying yourself as an independent contractor for the Company. Express
only your personal opinions. Never represent yourself as a spokesperson for the Company. If the
Company is a subject of the Social Media Communication you are creating, be clear and open
about the fact that you are an independent contractor for the Company and make it clear that
your views do not represent those of the Company, fellow independent contractors, Company
personnel, consumers, customers, business associates and/or others associated with or working
on behalf of the Company. If you do publish a blog or post online related to the work you do or
subjects associated with the Company, make it clear that you are not speaking on behalf of the
Company, and include a disclaimer such as "The postings on this site are my own and do not
necessarily reflect the views of the Company."

## Offensive or Inappropriate Social Media Communication

Independent contractors are strongly cautioned against creating or disseminating Social Media
Communication that is discriminatory, harassing, intimidating, threatening, lewd, offensive,
coercive, abusive, demeaning or otherwise unprofessional towards the Company or its
employees, consumers, customers, business associates, or others who are associated with or work
on behalf of the Company.

## Use of the Company's Trademarks

Torchmark Corporation and its affiliates own trademarks for their various and respective
corporate and product names and logos. An independent contractor's use of the Company's
trademarked names and logos in the independent contractor's Social Media Communication,
marketing, recruiting and training materials (collectively, "Independent Contractor Materials") is
permissible only by way of the Company's grant of a license to the independent contractor
authorizing such use. The Company reserves the right to review and approve any and all use of

ZINSKY001819

its names and logos in Independent Contractor Materials prior to such use.  With regard to names and logos associated specifically with Torchmark Corporation, absent express authorization from the Company, independent contractors are not authorized to use the Torchmark Corporation "torch" logo in Independent Contractor Materials, and may only use the Torchmark Corporation name or derivations thereof (*e.g.*, Torchmark Corp., Torchmark, TMK, etc.) when same are used to reference that Torchmark Corporation is the parent company of a given affiliate (*e.g.*, "American Income Life Insurance Company is a wholly owned subsidiary of Torchmark Corporation.").  Independent Contractor Materials should never state or suggest that the independent contractor or the independent contractor's agency office is owned by or directly associated with Torchmark Corporation and/or any of its affiliates.  Rather, Independent Contractor Materials should clearly identify the independent contractor and/or the independent contractor's agency office.  See also the "Advertising Guidelines" herein.

**Local Digital Media**
By agreement with its independent contractors who own and operate one or more agency offices, the Company assists in the creation and maintenance of Internet microsites related to those contractors' respective offices.  Such microsites help to promote brand consistency and generate positive online reputation.  The Company authorizes independent contractors who own and operate one or more agency offices to access the Company's Hearsay Social account in order to manage their respective offices' Social Media Communication.  As a guideline, the Company provides preapproved content in the Hearsay Social Content Library for use by such independent contractors.  In the interest of reputation management and branding consistency, agency office business pages should use the Company's recommended naming scheme and brand graphics.  The Company's various logos may not be altered and used on local digital media.

**Advertising Guidelines**
"Advertising" means any material, whether digital or otherwise, that is used to promote interest in the Company or its products.  Independent contractors are encouraged to use the Company's preapproved advertising materials to assist with prospecting efforts. These preapproved advertising materials can be used immediately, thus maximizing efficiency.  Preapproved advertising materials that are manipulated, altered or modified in any manner become unique advertising materials that must be reviewed and approved by the Company prior to use.  If you choose to create your own advertising materials, you must follow this Policy and other Company guidelines, including the Company's advertising submission requirements.  Keep in mind that some advertising requires state approval, which can take 90 days or more to obtain.

Independent contractors who own and operate one or more agency offices are responsible for reviewing advertising materials created by the independent contractors in those respective offices in order to ensure that they comply with this Policy.  Such advertising materials must comply with this Policy and other guidelines found on the Company's agency office-facing website, and must be submitted to the Company for its review and approval prior to use.

**Reporting Violations**
The Company requests and strongly urges independent contractors to report any violations, perceived violations or possible violations of this Policy to the Company's Social Media Committee (socialmedia@torchmarkcorp.com).

**Corrective Actions for Violations**

ZINSKY001820

The Company will investigate and respond to all reports of violations of this Policy and other related policies.  Violation of this Policy will result in disciplinary action, up to and including immediate contract termination pursuant to the terms of the contract.  Discipline or contract termination will be determined based on the nature and factors of the Social Media Communication and/or Independent Contractor Materials in question.

RENEE M ZINSKY

_____

Name (Printed)

_____

Signature

02/13/2019

_____

Date

ZINSKY001821

# EXHIBIT 4

ZINSKY001822

# Globe Life Inc.

# Code of Business Conduct and Ethics

Ed. August 2019

ZINSKY001823

Table of Contents

Introduction                                                                      4
Compliance with Laws, Rules and Regulations                                       4
Conflicts of Interest                                                             4
Insider Trading                                                                   5
Corporate Opportunities                                                           7
Competition and Fair Dealing                                                      7
Equal Opportunity                                                                 7
Health and Safety                                                                 8
Public Company Reporting                                                          8
Record-Keeping                                                                    8
Confidentiality                                                                   9
Protection and Proper Use of Company Assets                                       9
Payments to Government Personnel                                                 10
Reporting Illegal or Unethical Behavior; Non-Retaliation                         10
Escalation of Potentially Material Ethical Complaints or Concerns                11
Amendment, Modification and Waiver of the Code                                   11
Compliance Procedures                                                            11

ZINSKY001824

4. <u>Corporate Opportunities</u>

Employees, officers, directors and contractors are prohibited from taking for themselves personally opportunities that are discovered through the use of corporate property, information or position without the consent of the Board of Directors. No employee, officer, director or contractor may use corporate property, information, or position for personal gain, and no employee, officer, director or captive insurance agent may compete with the Company directly or indirectly. Employees, officers, directors and contractors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

5. <u>Competition and Fair Dealing</u>

We seek to outperform our competition fairly and honestly. The Company seeks competitive advantages through superior performance, never through unethical or illegal business practices. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. You should endeavor to respect the rights of and deal fairly with the Company's customers, suppliers, competitors, employees and contractors. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice.

Business entertainment and gifts in a work-related setting should only be used to create good will and sound working relationships, not to gain an unfair advantage over actual or potential competitors or with customers or suppliers. No gift or entertainment should ever be offered, given, provided or accepted by any Company employee, family member of an employee or agent unless it: (1) is not a cash gift, (2) is consistent with customary business practices, (3) is not excessive in value, (4) cannot be construed as a bribe or payoff and (5) does not violate any laws or regulations. Please discuss with your supervisor or the Legal Department any gifts or proposed gifts to be given or received which you are not certain are appropriate.

6. <u>Equal Opportunity</u>

The Company has a policy of equal opportunity free from discrimination because of race, sex, marital status, age, color, religion, creed, national origin, physical, sensory or mental disability, veteran status, sexual orientation, gender identity, gender expression, or other protected status or characteristic protected by law. Consistent with this principle, it is also the Company's policy not to discriminate in hiring and or promotion based on sexual orientation, gender identity or gender expression. The Company is committed to providing an inclusive and welcoming environment for all members of our community and to ensuring that employment, promotion and workplace advancement decisions are based on the individual's abilities and qualifications. The Company is morally and legally committed to giving all persons equal opportunities based solely on their individual qualifications and the valid requirements of the position.

ZINSKY001825

This policy ensures that only relevant factors are considered and that equitable and consistent standards of conduct and performance are applied.

    7.    <u>Health and Safety</u>

The Company strives to provide a safe and healthy work environment. Each of us has a responsibility to help maintain a safe and healthy workplace for everyone by following safety and health rules and practices and reporting accidents, injuries and unsafe equipment, practices or conditions.

Violence and threatening behavior are not permitted. You should report to work in condition to perform your duties, free from the influence of illegal drugs or alcohol. The use of illegal drugs in the workplace will not be tolerated.

    8.    <u>Public Company Reporting</u>

As a public company, it is of critical importance that Globe Life Inc.'s filings with the Securities and Exchange Commission be accurate and timely.  Depending on your position with the Company, as an employee, officer, director or contractor, you may be called upon to provide necessary information to assure that Globe Life Inc.'s public reports are complete, fair and understandable. The Company expects employees, officers, directors and contractors to take this responsibility very seriously and to provide prompt accurate answers to inquiries related to Globe Life Inc.'s public disclosure requirements. The Company will not permit its employees, officers, directors or contractors to improperly influence the audit process or the accuracy of its financial statements, which are part of Globe Life Inc.'s public reports.

    9.    <u>Record-Keeping</u>

The Company requires honest and accurate recording and reporting of all information in order to make responsible business decisions. For example, only the true and actual number of hours worked should be reported for compensation purposes and use of business expense accounts should be documented and recorded accurately.

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Business records and communications often become public, and you should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood.  This applies equally to email, internal memos, and formal reports.  Records should always be retained or destroyed according to the Company's record retention policies.  In accordance with those

ZINSKY001826

policies, in the event of litigation or governmental investigation, please consult with the Company's Legal Department.

⸳ 10.  Confidentiality

Directors, officers, employees and contractors must maintain the confidentiality of confidential information entrusted to them by the Company or its suppliers or customers, except when disclosure is specifically authorized by the Legal Department or required by laws, regulations or legal proceedings.  Confidential information includes all non-public information that might be of use to our competitors or harmful to the Company, its customers or personnel, if disclosed.  It also includes information that suppliers and customers have entrusted to us.

Notwithstanding the foregoing, nothing herein shall prohibit a director, officer, employee or contractor of the Company from reporting possible violations of federal law or regulation to any governmental agency or entity or making other disclosures that are protected pursuant to federal law or regulation.  Prior authorization from the Legal Department is not required in order to make any such reports or disclosures and the reporting individual is not required to notify the Company that such reports or disclosures have been made.

IMMUNITY NOTICE.  Pursuant to the Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of the law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Should any provision in this Code of Business Conduct and Ethics conflict with this provision, this provision shall control.

11.  Protection and Proper Use of Company Assets

All directors, officers, employees and contractors should endeavor to protect the Company's assets and ensure their efficient use.  Theft, carelessness, and waste have a direct impact on the Company's profitability.  Any suspected incident of fraud or theft should be immediately reported for investigation.  Company equipment should not be used for non-Company business, though incidental personal use may be permitted.

Your obligation to protect the Company's assets includes its proprietary information.  Proprietary information includes intellectual property such as trade secrets, trademarks and service marks, as well as business, marketing and service plans, databases, records, salary information and any unpublished financial data and reports. Unauthorized use or distribution of this information violates Company policy.  It may also be illegal and may result in civil or even criminal penalties.

9

ZINSKY001827

12. Payments to Government Personnel

The U.S. Foreign Corrupt Practices Act prohibits giving anything of value, directly or indirectly, to officials of foreign governments or foreign political candidates in order to obtain or retain business.  It is strictly prohibited to make illegal payments to government officials of any country.

In addition, the U.S. government has a number of laws and regulations regarding business gratuities which may be accepted by U.S. government personnel, as well as gifts or payments to political parties or political candidates.  The promise, offer or delivery to an official or employee of the U.S. government of a gift, favor or other gratuity in violation of these rules not only violates Company policy but could also be a criminal offense.  State and local governments, as well as foreign governments, may have similar rules.  The Company's Legal Department can provide guidance to you in this area.

13. Reporting Illegal or Unethical Behavior; Non-Retaliation

Employees, officers, directors and contractors who suspect or know of violations of this Code or illegal or unethical business or workplace conduct by employees, officers, directors or contractors have an obligation to contact either their supervisor or superiors or the appropriate contact in the Company's Legal Department or the Human Resources Department.  If the individual to whom such information is conveyed is not responsive, or if there is reason to believe that reporting to such individuals is inappropriate in particular cases, then the employee, officer, director or contractor may contact the General Counsel of the Company.  Such communications will be kept confidential to the extent feasible.  If you are still not satisfied with the response, you may contact the Audit Committee of the Board of Directors of Globe Life Inc. by telephoning a toll-free number (1-877-854-0033) that is monitored by an independent third-party reporting service.  If concerns or complaints require confidentiality, then this confidentiality will be protected to the extent feasible, subject to applicable law.

You should read the Company's *Employee Complaint Procedures for Accounting and Auditing Matters*, located on the Company's website on the Investors page under Employee Complaint Procedures or obtain a written copy from the Corporate Secretary's Office.  It describes the Company's procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters. You may submit a good faith concern regarding questionable accounting or auditing matters under this policy without fear of dismissal or retaliation.

The Company prohibits retaliation of any kind against individuals who have made good faith reports or complaints of violations of this Code or other known or suspected illegal or unethical conduct. You are expected to cooperate in internal investigations of misconduct.

ZINSKY001828

# EXHIBIT 5

ZINSKY001829

**From:** Renee Zinsky [mailto:rzinsky@ariasagencies.com]
**Sent:** Wednesday, November 10, 2021 8:41 AM
**To:** Debbie K. Gamble <dgamble@allife.com>
**Subject:** Work

**External Message – Think Before You Click**

Hi Debbie,
 My name is Renee Zinsky. I have some things I would love the chance to discuss with you. If you could please let me know when would be a good time to talk, I would really appreciate it!

Thank you!

Renee Zinsky
724-831-8233
Arins Agencies
Supervising Agent

This message contains information which is privileged and confidential and is solely for the use of the intended recipient. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this in error, please destroy it immediately and notify us at PrivacyAct@globe.life.

ZINSKY001830

# EXHIBIT 6

ZINSKY001831

I wanted to write a follow up statement after meeting with Simon. I recently came to him in regards to my experience with Mike Russin throughout my career with AIL.

-I don't believe a word out of Mikes mouth for many different reasons. He is not an honest man and I no longer can work under someone who speaks and preaches nothing but lies. He contradicts himself on the daily.

-Mike is very open and honest when it comes to being a flirtatious guy and has also perused quite a few different women on the team. His wife Geneva also recently shared screenshots of him saying absolutely appalling things to her which just solidified the kind of man that he is and how off it is from what he portrays himself as.  He is an incredibly hard worker. There is no doubt about that. But when it comes to his morals and human decency, he has none other then when it comes to donating money.

-He had once sent me a snap chat message of him saying "The only way you can get MGA is if you and Mal blow me at the same time." I had taken a screenshot of it and because it was on snap chat messenger it told him that I had taken a screenshot of the chat. He then got incredibly angry telling me to delete it and send him a picture of my photo album to show it was deleted. I did so and then afterwards I had remembered that there is a "deleted" photo album on iPhones. I went to that album and recovered the photo in honest hopes that I would never have to ever bring that up.

-Almost every day there was some sort of aggressive GroupMe messages. Saying things like, "we need to be ran like a cult" and that is 100% how it's ran. He will publicly berate people. He as well as most of the other managers in the "manager group-me" makes fun of people constantly. It's honestly sickening. Mike also forces you to work a 9-9 schedule or else threatens to terminate you or take away your leads. Mind you, we are 1099. It is a beyond Toxic environment and it's no wonder why Christie and Travis separated, as well as many other amazing people that left that could have been incredible at the business. For example: Stephanie Hoerz, Joseph Lamb, Matthew Mamros, Aaron Osterrieder, etc.

The photos are attached are including some that Geneva had shared with me. I know this is a bit all over the place but that's because my thoughts go back over a year and a half. My main thing is to make sure that no one else has to deal with what I and myself have dealt with. I also want to make sure that there is some sort of repercussion, because he needs to know that these things are not okay. I can provide more information if needed but I wanted to get this sent over to you as soon as possible.

Thank you.


Renee Zinsky
724-831-8233
Arias Agencies
Supervising Agent

ZINSKY001832

# EXHIBIT "C"

**Amy Williamson** <amywilliamson114@gmail.com>
to Logan, bcc: Renee ⌄

Fri, Feb 18, 2022, 3:52 PM   ☆   ↩   ⋮

Dear Logan,

I am writing to follow up with you again with regard to the conclusion of the investigation relative to my client's reports of unethical business conduct and fraud.  Given the dilatory approach that AIL/Globe has taken to date, *inter alia*, it is apparent that your clients have not - and continue not to - respond to these very serious complaints in good faith, let alone in compliance with its corporate policies as well as the applicable laws and SEC regulations.

More specifically, Ms. Zinsky first submitted this report approximately NINE MONTHS AGO in compliance with the corporate policies and procedures.  Without hearing anything responsive, she then escalated it by reporting it a second time approximately SEVEN MONTHS AGO.  She heard absolutely nothing in response until you and Janet connected with her in November.  At that point, it was clear that NOTHING HAD BEEN DONE FOR FIVE MONTHS.  In the meantime, the fraud continued and AIL/Globe conveniently continued to profit therefrom.

Approximately a month later (December 17, 2021), AIL/Globe first began to look into my clients complaints when we met with Janet for about an hour.  When Janet ended the meeting, muy client inquired why she wasn't interested in investigating the unethical/fraudulent business practices complaint. Janet responded that she was not authorized to do so.  Shocked, my client followed Janet's lead and didn't question her further.  On December 18, 2021, I followed up with Janet on the matter inquiring why AIL/Globe Life had decided not to investigate.  The same day, Janet responded by confirming that Globe would be investigating but didn't provide any point of contact for said investigation.  I sent Janet another follow up email that day requesting contact information for the investigation.

On December 20, 2021, Janet responded stating that AIL/Globe needed "the consumer complaint ... in order to facilitate the investigation."  I responded the same day reminding Janet that the complaint that she was referencing had been provided to her directly (about a month earlier).  What is more,  Ms. Zinsky provided it to two other AIL/Globe representatives (along with a myriad of other information) on two prior occasions.  Yet, unbelievably, that was holding up the "investigation" for OVER SIX MONTHS at that point.  Needless to say, Ms. Zinsky (and I) had lost all faith in AIL/Globe's ability to conduct an effective investigation at that point.

On January 5, 2022, I followed up with Janet yet again requesting a point of contact for the alleged investigation.  She advised that it was being handled internally and invited my client to work with the internal team to help "facilitate" the investigation.  I would have thought it would go without saying, but I reminded Janet that my client (and other witnesses) did not trust AIL and would not be comfortable working directly with AIL.

On January 20, 2022, I then followed up with you for a status update.  I received no response.  I followed up with you again via email on January 24, 2022.  At that time you responded that you were "unable to provide an update" and asked for additional information from my client. Again, I pointed out that she had already provided a significant amount of information on at least 3 different occasions to 3 different AIL representatives. Yet AIL still seemed to have little to no appreciation of the nature of her complaints.  At the same time, I again requested that you advise once the investigation was completed.  I never heard back.

On February 16, 2022, I followed up with you yet again requesting an update.  On February 17, 2022, approximately NINE MONTHS POST COMPLAINT, you advised for the first time that AIL had concluded the investigation.  However, you failed to provide any substantive response in terms of the investigative findings.

Yet again, I am refreshing my request for a meaningful response that I can take back to my client.  Despite the fact that her complaints are now 9 months stale without a substantive response, AIL, Globe Life, Arias Agencies and the individual perpetrators continue to enjoy an abundance of profits and luxurious lifestyles from the exact conduct Ms. Zinsky reported.  What is more, they are proud and eager to show off  the abundance of profits from said conduct, lack of education, and droves of sordid stories full of crime, deceit, misogyny, and violence.

On a final note, please remind the representatives from AIL's "proper department" that conducted this investigation to preserve all information that could be potentially relevant to Ms. Zinsky's claims.  I have sent Janet a couple of preservation notices which include such information and materials.  I assume you have copies of those notices.  If not, please let me know and I'll be happy to send them to you directly.  I look forward to hearing from you at your earliest convenience.

Amy

# EXHIBIT "D"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RENEE ZINSKY, | CIVIL ACTION |
| Plaintiff, | No. 2:22-cv-547 |
| v. | Judge Horan |
| MICHAEL RUSSIN, RUSSIN FINANCIAL, RUSSIN GROUP, SIMON ARIAS, III, ARIAS AGENCIES, S.A. HOLDING AMERICAN INCOME LIFE INSURANCE COMPANY, | |
| Defendant. | JURY TRIAL DEMANDED |

**PLAINTIFF'S INITIAL DISCLOSURES**

Plaintiff Renee Zinsky, through her undersigned counsel, makes her initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedures and the Court's scheduling order.

## I.   INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

**A.   Liability**

1.   Renee Zinsky
     5023 Sutton Place
     Wexford, PA 15090

     Plaintiff has information concerning the allegations in her complaint.

2.   Malorie Fry
     5023 Sutton Place
     Wexford, PA 15090

     Ms. Fry has information concerning the allegations in Plaintiff's complaint.

3.   Michael Russin
     11 Noble Lane
     Windham, ME 04062

     Mr. Russin is believed to have information concerning the allegations in Plaintiff's complaint.

.
4.   Geneva Russin
     11 Noble Lane
     Windham, ME 04062

     Mrs. Russin is believed to have information concerning Defendant, Michael Russin's inappropriate behavior toward Plaintiff and other females.

| | | |
|---|---|---|
| 5. | Simon Arias<br>103 Indian Meadow Drive<br>Mars, PA 16046 | Mr. Arias is believed to have information regarding Defendant Michael Russin's hiring/employment with AIL/Arias Agencies, termination of Mr. Russin, Plaintiff's reports of fraud, sexual harassment and sexual assault, Defendants' response(s) thereto, Defendants' policies and procedures regarding same. |
| 4. | Chrissy Vansuch<br>14612 Mirabelle Vista Circle<br>Tampa, FL 33626<br>813-475-4839 | Ms. Vansuch is believed to have information regarding Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' response(s) thereto, Defendants' policies and procedures regarding same. |
| 5. | Natalie D'Achilles<br>150 Lake Drive<br>Wexford, PA 15090<br>724-612-3361 | Mrs. D'Achilles is believed to have information regarding Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' response(s) thereto, Defendants' policies and procedures regarding same. |
| 6. | Katie McCabe<br>150 Lake Drive<br>Wexford, PA 15090<br>412-848-6722 | Ms. McCabe is believed to have information regarding Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' response(s) thereto, Defendants' policies and procedures regarding same. |
| 7. | Steven Greer<br>1200 Wooded Acres<br>Waco, TX 76710 | Mr. Greer is believed to have information regarding Mr. Russin's employment, Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' policies and procedures regarding same. |
| 8. | David Zophin<br>1200 Wooded Acres<br>Waco, TX 76710 | Mr. Zophin is believed to have information regarding Mr. Russin's employment, Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' policies and procedures regarding same. |
| 9. | Debbie Gamble<br>1200 Wooded Acres<br>Waco, TX 76710 | Ms. Gamble is believed to have information regarding Mr. Russin's employment, Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' response(s) thereto, Defendants' policies and procedures regarding same. |

| 10. | Soyla Villareal<br>1200 Wooded Acres<br>Waco, TX 76710 | Ms. Villareal is believed to have information regarding the Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' response(s) thereto, Defendants' policies and procedures regarding same. |
|---|---|---|
| 11. | Janet Hendrick<br>Phillips Murrah<br>710 Rawlins Street, Suite 900<br>Dallas, TX 75219 | Ms. Hendrick is believed to have information regarding Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' response(s) thereto, Defendants' investigation of Plaintiff's complaints, AIL's termination of Mr. Russin. |
| 12. | Logan Blackmore<br>700 S Stonebridge Drive<br> McKinney, TX 75070 | Ms. Blackmore is believed to have information regarding Plaintiff's reports of fraud, sexual harassment/sexual assault, Defendants' response(s) thereto, Defendants' investigation of Plaintiff's complaints. |
| 13. | Jeremiah Russin<br>11 Noble Lane<br>Windham, ME 04062 | Mr. Russin is believed to have information regarding the employment and termination of Michael Russin, ownership, business, and operations of Russin Financial |
| 14. | Chris Gilbert<br>Bridgeville, PA | Mr. Gilbert is believed to have information regarding the employment and termination of Michael Russin, unethical and inappropriate behavior of Mr. Russin, and the business and operations of Russin Financial |
| 15. | Brendan Gilbert<br>Carnegie, PA | Mr. Gilbert is believed to have information regarding Mr. Russin's inappropriate behavior, business and operations of Russin Financial |
| 16. | Cameron Labrie<br>Portland, ME | Mr. Labrie is believed to have information regarding Mr. Russin's unethical and inappropriate behavior, business and operations of Russin Financial |
| 17. | Ray Salmon<br>Saegertown, PA | Mr. Salmon is believed to have information regarding sexual harassment/assault by Mr. Russin, Mr. Russin's inappropriate behavior, business and operations of Russin Financial |

| 18. | Travis Vaughn<br>Erie, PA | Mr. Vaughn is believed to have information regarding the employment of Mr. Russin, Mr. Russin's unethical and inappropriate behavior, business and operations of Russin Financial |
|---|---|---|
| 19. | Maria Folino<br>1565 Hastings Mill Road<br>Pittsburgh, PA 15241 | Ms. Folino is believed to have information regarding Mr. Russin's unethical and inappropriate behavior, business and operations of Russin Financial |
| 20. | Joe Lamb<br>Wexford, PA | Mr. Lamb is believed to have information regarding Mr. Russin's unethical and inappropriate behavior, business and operations of Russin Financial |
| 21. | Shannon Vaughn<br>931 Benton Avenue<br>Pittsburgh, PA 15212 | Ms. Vaughn is believed to have information regarding Mr. Russin's inappropriate behavior, business and operations of Russin Financial |
| 22. | Charles Ferarri<br>North Versailles, PA | Mr. Ferrari is believed to have information regarding Mr. Russin's unethical and inappropriate behavior including but not limited to recent threats of violence |
| 23. | Brian Welsh<br>Kennedy, PA | Mr. Welsh is believed to have information regarding Mr. Russin's inappropriate behavior |
| 24. | David Burkes<br>New Castle, PA 16101 | Mr. Burkes is believed to have information regarding Mr. Russin's inappropriate and unethical behavior |
| 25. | Tyler Szpakowski<br>Pittsburgh, PA 15216 | Mr. Szarkowski is believed to have information regarding Mr. Russin's inappropriate and unethical behavior |
| 26. | Christina Quillen<br>Miami, FL | Ms. Quillen is believed to have information regarding Mr. Russin's inappropriate and unethical behavior, and Mr. Russin's termination |

**B.**     **Damages**

| | | |
|---|---|---|
| 1. | Plaintiff<br>5023 Sutton Place<br>Wexford, PA 15090 | Economic and non-economic damages including pain and suffering. |
| 2. | Malorie Fry<br>5023 Sutton Place<br>Wexford, PA 15090 | Economic and non-economic damages |
| 3. | Susan Federoff, M.D.<br>1500 Village Run Road<br>Wexford, PA 15090 | Plaintiff's economic and non-economic damages including pain and suffering |
| 4. | Counseling and Wellness Center of Pittsburgh<br>9401 McKnight Road<br>Pittsburgh, PA 15237 | Plaintiff's economic and non-economic damages including pain and suffering. |
| 5. | Cranberry Psychological Center<br>100 Northpointe Circle<br>Seven Fields, PA 16046 | Plaintiff's economic and non-economic damages including pain and suffering |

**II.     DOCUMENTS PLAINTIFF MAY USE IN SUPPORT OF HER CLAIMS**

1. Naked photograph of Mr. Russin sent by Mr. Russin to Plaintiff.
2. Electronic messages from Mr. Russin to Plaintiff regarding inappropriate sexual propositions and content.
3. Emails, text messages, GroupMe messages, other electronic messages from Michael Russin to Plaintiff and other coworkers containing inappropriate, violent, aggressive, sexualized, or otherwise offensive content.
4. Arias University's sexual harassment and drug use policies
5. Plaintiff's emails and correspondence to various representatives on behalf of the Defendants in attempts to report fraud, sexual assault/sexual harassment, including but not limited to Chrissy Vansuch, Katie McCabe, Natalie D'Achilles, Debbie Gamble.
6. Any and all information, documents, videos, and/or other information contained in the investigative files of Arias Agencies in relation to Plaintiff's complaints.
7. Any and all information, documents, videos, and/or other information contained in the investigative files of AIL and Globe Life regarding Plaintiff's complaints.
8. Any and all information, documents, videos, and/or other information contained in the investigative files of Janet Hendrick and Phillips Murrah regarding Plaintiff's complaints.
9. Text messages, emails and/or other correspondence between Geneva Russin and Plaintiff regarding Mr. Russin's inappropriate conduct and sexual affairs/relationships with numerous women.

10. Text messages, emails and/or other correspondence between Michael Russin and Geneva Russin regarding Mr. Russin's inappropriate conduct and sexual affairs/relationships with numerous women.

11. Text messages, videos, photographs, media posts, and other electronic messages from Michael Russin intended to threaten and/or intimidate Plaintiff and/or Plaintiff's representatives.

12. Photographs, videos of business meetings (on and offsite) at Arias Agencies and Russin Financial.

13. Photographs, videos and other records of Plaintiff's medical treatment following unknowingly ingested "date rape" drugs.

14. Social media posts from November 2018 through present on behalf of Michael Russin, individually, including but not limited to the ongoing preservation of Mr. Russin's Instagram account at ceo_russin@instagram.com and records relating to recent deletion of same.

15. Social media posts made on behalf of Russin Financial and/or its agents from November 2018 through present including but not limited to posts on behalf of Michael Russin, Jeremiah Russin, Brent Henderson, Vienna Howatt, Rachel Yocca, etc.

16. Social media posts from November 2018 through present made on behalf of Absideon Achievement, Absideon Consulting and/or its agents including but not limited to complete podcast recordings accessible on websites such as Podbean, Spotify, YouTube, including but not limited to absideon.consulting@instagram, absideon_achievement@instagram, etc.

17. Social media posts made on behalf of Arias Agencies and/or its agents including but not limited to "The Grindcast" video recordings including but not limited to Instagram, Facebook, Tiktok, Youtube, etc.

18. Social media posts made on behalf of Simon Arias and/or his agents including but not limited to Instagram, Facebook, Tiktok, YouTube, etc.

19. Customer complaints regarding Mr. Russin's unethical and inappropriate conduct.

20. Correspondence or other documentation relating to complaints made on behalf of AIL and/or Arias Agencies agents with regard to Mr. Russin's inappropriate and/or unethical behavior.

## III.   DAMAGES AND SUPPORTING DOCUMENTATION

1. Income reports generated by Arias Agencies, AIL, and/or Russin Financial relating to agents' income.

2. Correspondence, electronic texts, GroupMe messages, social media posts and/or other memorialization and/or publication of AIL, Arias Agencies and/or Russin Financial agents' income.

3. Social media posts made on behalf of Absideon Consulting and/or Absideon Achievement relating to AIL, Arias Agencies and/or Russin Financial agents' income.

4. Plaintiff's tax returns for 2019 - 2021

5. Plaintiff's recent pay stub from Virgo & Garnet

Respectfully submitted,

**Williamson Law LLC**

/s/ Amy N. Williamson
Amy N. Williamson
PA I.D. No. 90657

429 Fourth Avenue
Pittsburgh, PA 15219
Telephone: (412) 600-8862
awilliamson@awilliamsonlaw.com

**Attorney for Plaintiff**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify on this 23rd day of September, 2022 I served a copy of the foregoing

***Plaintiff's Initial Disclosures*** via electronic mailing upon the following:

Benjamin D. Webb
Cozza Law Group, PLLC
400 Holiday Drive, Suite 210
Pittsburgh, PA  15220
bwebb@cozzalaw.com

/s/ Amy N. Williamson
Amy N. Williamson

# EXHIBIT "E"



# AMY N. WILLIAMSON
### ATTORNEY AT LAW

September 5, 2022

**<u>VIA EMAIL</u>**
bwebb@cozzalaw.com

Benjamin D. Webb
Cozza Law Group PLLC
400 Holiday Drive, Ste 210
Pittsburgh, PA 15220

> **Re:** ***Renee Zinsky vs. Michael Russin et. al***
> 2:22-cv-00547-MJH
> For Settlement Purposes Only Pursuant to Fed.R.Civ.P. 408

Dear Ben:

Please allow this correspondence to follow up on our conference with Judge Horan on September 1st. Judge Horan stated, in no uncertain terms, that it would be in your client's best interest to make a good faith attempt to resolve this matter at this time.  More specifically, Judge Horan stated that, based on her review of this case, she was ***"appalled"*** by your client's conduct and couldn't ***"believe that anyone could be so brash"*** given his ongoing exposure in this case. She went on to explain that Mr. Russin continues to ***"shoot himself in the foot"*** which ***"makes the Plaintiff's case for her"***. Judge Horan went so far as to state that if Mr. Russin does not settle this matter near term, he will have ***"more problems than this lawsuit"*** and risks ***"extensive exposure with significant damages"*** going forward. The Judge asked you to ***"get your client under control"*** and declared that his behavior ***"would not be tolerated"*** by the Court.

For those reasons, Judge Horan stated that she would not be mandating ADR at this time.  Instead, the Court recommended that Plaintiff provide a settlement demand to all of the Defendants in this case.  I have copied counsel for the other Defendants hereto.



Before addressing Plaintiff's demand, I would like to take this opportunity to elaborate on Judge

1

Horan's concerns with regard to Mr. Russin's ongoing conduct.  Incredibly, *within two days following the Court's comments and instructions*, Mr. Russin continued to conduct himself in the same reprehensible manner. For example, on September 3, 2022, Mr. Russin published a podcast titled *How to Be a Closer, Fuel for the Fire, and False Gospel Preachers*. At that time, Mr. Russin made a variety of statements (presumably related to closing sales) in a brash, appalling, and aggressive manner to include the following:

- *I've always been a closer. I'm not tooting my own horn. It's just a fact … It doesn't matter what it is … closing in business and in life are the same. Everything in life is closing … **If you're a man … you got to close a woman.***
- *Closing is such an essential skill in life… **You can't be a dog, especially as a man and not know how to close.***
- *At the end of the day, whoever it is, a woman, bank teller, loan officer, girl across from you at the bar… the first thing they are buying is you … People are animals.*
- *I got a guy that works at one of my organizations … **This guy can smell when women are ovulating.***
- ***I can tell you right now, there's no human being on this planet that can take me out of the game** … when they see you go through massive amounts of adversity and still come out on top, they want to drag you right down into the pit … they have such low self-worth that they can't stand to see people win … **They don't have the balls** to go out and win … You gotta grab and pull him back down … **in this bucket of misery and shit with us.***
- ***So when someone else becomes so focused on you that they want to take you out of the game** and you just keep going out and working and winning… like our recruiting company just had its biggest week ever … we built a million dollar a year business within 6 months.*
- *Keep denting me, go ahead… bounce me around, beat me up …. I love it. **I have a sick relationship with pain. It makes me so much better…** Thank you haters! Haters make me greater!*
- *But you don't want to hyper fixate on that … **Then you start feeding your dark side too much… That's when you want to lash out. That's when you do something that you shouldn't do.***
- *You can't jeopardize the rest of your life over a hater… **You go to jail for felonious assault**.*
- ***I'm not strong enough. I'm not good enough. We are all inherently wicked.***
- *It's not that I'm not good enough. **I'm not good all.***
- *I've struggled with this a lot in the past couple of months… I feel worse now than I ever have in my life … **I am more convicted and disgusted with myself now than I have ever been in my entire existence on this planet.***
- *The process of sanctification … it never ends … **Because when you remove the big sins, you just become aware of the medium ones… Like … I'm not having sex with a bunch of people or doing drugs … or cheating on my wife** … Then you become violently aware of the small things … You should feel worse than you ever have in your life … you should be remorseful.*
- *Please donate. Please help us.*

Similarly, on the same day (September 3, 2022), Mr. Russin posted a photograph of himself with the caption ***"War Ready"*** on social media. Of course, these statements are no different than Mr. Russin's other public statements such as ***"Money Grubbing Whores"*** (referencing women who claim sexual assault

and sexual harassment), ***"I do everything fast, even cummies"***, or ***"Vax this Dick"*** but they are even more shocking and remarkable given the timing, i.e. days following Judge Horan's clear and direct reprimand of said conduct.

There are multiple witnesses who will testify that these types of comments are, and continue to be, typical for Mr. Russin in the AIL office and at other AIL work settings for years, including the past 6 months. The witnesses will testify that Mr. Russin's recent comments are often followed by even more brash statements such as *"What are you going to do about it, fire me?"* As you may know, Mr. Russin has voluntarily published the same statements over the past six (6) months in other capacities.

These are merely the "highlights" of Mr. Russin's most recent brash and appalling conduct. As you know from Plaintiff's Amended Complaint, there are droves of similar vulgar, misogynistic, aggressive, and violent comments and conduct on behalf of Mr. Russin in his capacity as an agent of AIL and Arias Agencies over the years. Although Mr. Russin's conduct is perhaps the most vile and egregious that I am aware of, make no mistake… there are just as many examples of other male agents' depraved conduct that will be evidence of the toxic and hostile work environment which Defendants have subjected Plaintiff to over the past 3.5 years. Of course, the extensive list of witnesses (including Mr. Russin's wife, Geneva Russin), documents, texts, photographs, videos, and other evidence will be shared over the course of discovery near term.

As you may know, AIL acknowledged Mr. Russin's appalling conduct by allegedly attempting to terminate his contract on or about February 2022. AIL's counsel referred to the alleged termination as a "remedial measure" resulting from AIL's investigation of Plaintiff's claims of sexual harassment. Yet, unbelievably, Mr. Russin continues to work on behalf of AIL through present. Mr. Russin performs professional services on behalf of AIL, receives income from AIL, works out of the same AIL office[1], manages and attends AIL meetings, and continues to manage the same team of AIL agents as he did prior to his alleged termination. Typically, I would assume that you are already aware of these facts. Given your recent inquiries about Mr. Russin's conduct[2], however, I wanted to be sure to clarify any such confusion with all defense counsel. Defendants' ongoing inability to provide Plaintiff with a safe working environment was clearly reflected by Judge Horan's concerned comments about the ***"escalating"*** nature of Defendants' exposure.

Whether Defendants refer to Mr. Russin as a "consultant", "contractor", or otherwise, it is of no matter since he continues to function as an agent on behalf of the Defendants, and in a leadership role at that … just as he did during his daily drug and alcohol abuse, just as he did during countless episodes of sexual harassment, just as he did during his felonious criminal charges and convictions, and just as he did during an involuntary commitment to a mental health facility. All of which occurred publicly while Mr. Russin was hired, employed, retained, and celebrated as a high-ranking leader by Simon Arias and AIL.

Based on Plaintiff's employment experience alone, Defendants' inability to provide a safe work environment was not a mere oversight, but rather a choice. Perhaps the most blatant example is that nothing has actually changed since AIL admitted to Mr. Russin sexually harassing Plaintiff and then

---

[1] AIL and/or Arias Agencies' Portland, Maine office.
[2] Contrary to your representations, this there is a significant amount of evidence to support Plaintiff's claims that Mr. Russin's private conduct is just as vile and offensive as his public "persona".

misrepresenting Mr. Russin's termination as a "remedial measure". Similarly, Plaintiff's complaints of sexual harassment and insurance fraud were concealed by Defendants for at least four months after being reported to Simon Arias.  And, for an additional five months, Globe Life and AIL continued to recognize Mr. Russin and Mr. Arias with "leadership" awards and generous incomes … all the while Plaintiff was traumatized and completely unable to work. What is more, Globe Life and the Defendants never even bothered to interview Plaintiff in connection with the alleged investigation of her documented reports of insurance fraud. What is more, that doesn't even address the experiences of numerous other witnesses who will testify to eerily similar experiences while working for the Defendants.





Please feel free to reach out should you have any questions or concerns.  Otherwise, I look forward to hearing from you once you have an opportunity to confer with your client(s).


Sincerely,


*/s/ Amy N. Williamson*


cc:    Jean Novak, Esq. (on behalf of Simon Arias III, S.A. Holdings, LLC, and Arias Agencies)
       Anne Dana, Esq. (on behalf of American Income Life Insurance Company)


5