Q  ≡ MENU



**THE UNIVERSITY OF CHICAGO**

**THE LAW SCHOOL**

## The University of Chicago Law Review

PRINT  *Comment*    85.5

# Master of Its Own Case: EEOC Investigations after Issuing a Right-to-sue Notice

Eric E. Petry  i

SHARE     

The Equal Employment Opportunity Commission (EEOC) is responsible for enforcing the full arsenal of federal employment discrimination laws. But in addition to vindicating the rights of employment discrimination victims, the EEOC also serves as a gatekeeper to screen claims before they get to court. As part of that gatekeeping function, Congress requires that individuals alleging employment discrimination under Title VII of the Civil Rights Act of 1964 must obtain permission from the EEOC before they can bring legal action on their own.

Title VII's text leaves the EEOC's role after issuing a right-to-sue notice ambiguous. Despite this ambiguity, or perhaps because of it, the EEOC promulgated 29 CFR § 1601.28(a)(3), which interprets Title VII as allowing the agency to continue its investigation when it would further the broad antidiscrimination mission Congress tasked it to carry out. The EEOC typically terminates its investigation after it issues a right-to-sue notice. But the times it has continued to investigate, the EEOC often has faced litigation challenging its statutory authority to do so.

The circuit courts to confront the ambiguity regarding the EEOC's authority in this context have come to conflicting results. On one side, the Fifth Circuit has held that the issuance of a right-to-sue notice strips the EEOC of its authority to investigate. On the other, the Seventh and Ninth Circuits have held that the EEOC not only retains its authority to investigate employment discrimination claims after issuing a right-to-sue notice, but that continued investigations promote the broad purposes of Title VII.

This Comment addresses this unresolved question through the lens of judicial deference to administrative agencies, a doctrine that the circuit courts largely have ignored. Applying the two-step analysis from *Chevron*, this Comment first argues that the text of Title VII is ambiguous and that Congress intended to give the agency the authority to interpret the statute's procedural provisions. It then argues that § 1601.28(a)(3) is both procedural and a reasonable interpretation of Title VII and that, therefore, the EEOC's interpretation is entitled to *Chevron* deference.

**+  TABLE OF CONTENTS**

Exhibit 3

# Introduction TOP ↑

Often dismissed as a second-class agency with little power,[1] the Equal Employment Opportunity Commission (EEOC) actually plays a crucial role in antidiscrimination efforts and is tasked with enforcing every employment discrimination statute in the federal arsenal.[2]  Chief among the EEOC's responsibilities is its mandate under Title VII of the Civil Rights Act of 1964[3] to eliminate employment discrimination on the basis of race, color, religion, sex, or national origin.[4]  The ability to investigate charges of discrimination is central to this mission and is among the EEOC's most potent weapons.

A circuit split recently deepened regarding the scope of the EEOC's investigative authority. Under Title VII, the EEOC has exclusive authority over employment discrimination charges for 180 days after a charge is filed or until it issues a right-to-sue notice to the charging individual.[5]  That means the aggrieved individual can bring a private civil action only after requesting and receiving a right-to-sue notice from the EEOC.[6]  The circuit split concerns whether the EEOC maintains the authority to investigate after it issues a right-to-sue notice.[7]

Only a few circuit courts have addressed this issue, but it has potentially serious implications for how the EEOC approaches charges of employment discrimination, what tools remain available to it, and how effective those tools are at policing discrimination. Indeed, it is not difficult to imagine a scenario in which preventing the EEOC from investigating claims after it issues a right-to-sue notice would allow employment discrimination to remain undiscovered and unaddressed.

Consider the following hypothetical scenario. After being denied a promotion in favor of a more junior and less qualified coworker, an employee files a charge of discrimination with the EEOC. Not only was the employer's decision, in fact, based on discriminatory animus, but its discriminatory practices have also impacted a number of other similarly situated employees. As required by statute, the EEOC notifies the employer of the charge and begins its investigation.[8]  But at the end of the statutorily mandated 180-day period of exclusive jurisdiction,[9] the EEOC has not yet finished its investigation due to the complexity of the case and, more importantly, the employer's uncooperative and obstructive conduct. Typically, the charging individual in this situation does not immediately request a right-to-sue notice because she has an incentive to let the agency pursue the claim with its resources.[10]  But here, the employer understands that it could face serious liability if the EEOC investigation exposes the full breadth of its discriminatory practices. To avoid liability, the employer offers the charging individual a lucrative settlement if she agrees to demand a right-to-sue notice from the EEOC. In this scenario, if the right-to-sue notice strips the EEOC of its ability to continue investigating, the Commission will fail in its duty to protect the public interest against employment discrimination because it will be unable to uncover the systemic pattern of discrimination.[11]

This Comment argues that the EEOC's authority to investigate claims of employment discrimination extends beyond, and is unaffected by, the issuance of a right-to-sue notice to the charging individual. Evaluating the EEOC's Title VII authority through the lens of judicial deference to administrative agencies under the framework established in *Chevron U.S.A. Inc v Natural Resources Defense Council, Inc*[12] confirms this position.[13]  Although the text of Title VII and its legislative history suggest no temporal restraint on the EEOC's investigatory power, Congress did not definitively speak to the question.[14]  Given this statutory ambiguity and the EEOC's regulatory interpretations, analysis of deference under *Chevron* is essential to resolving this question. Yet, surprisingly, the circuit courts involved in this debate have not considered whether deference is appropriate.[15]  By relocating the debate, this Comment demonstrates that the EEOC properly interpreted its investigatory authority under Title VII and that courts should defer to the EEOC's position.

The remainder of this Comment proceeds as follows: Part I discusses the history and creation of the EEOC, the steady expansion of its authority over time through legislation and court opinions, the current state of the EEOC's authority under Title VII, and EEOC interpretations of that power. Part II examines the circuit split that has developed regarding the EEOC's authority to investigate claims after the issuance of a right-to-sue notice and identifies a key issue left unaddressed by the courts: judicial deference to administrative agencies.

Finally, Part III relocates the debate and addresses the agency deference question to fill the analytical gaps left by the circuit split before examining the issue in light of the broad purpose of Title VII. This analysis concludes that the EEOC maintains the authority to investigate a claim of employment discrimination even after it issues a right-to-sue notice to the charging individual.

# I. EEOC Enforcement Power under Title VII                TOP ↑

Since the circuit split at the heart of this Comment centers on how to interpret the EEOC's enforcement authority under Title VII, this Part first provides an overview of the statutes and regulations that make up the legal background of the dispute. Compared with other agencies, the EEOC historically has been viewed as a "toothless, . . . poor, enfeebled thing."[16]  But while the EEOC lacks the same level of independent enforcement authority that other agencies enjoy, it nonetheless has great responsibility. History shows that Congress steadily expanded the scope of the EEOC's powers over time, and court decisions have consistently affirmed its important role as the preeminent enforcer of the federal government's antidiscrimination regime. Part I.A examines this history, tracing the expansion of the EEOC's power over time as Congress enacted legislation to increase its role in combating employment discrimination. Part I.B presents an overview of the EEOC's current enforcement process under Title VII. It highlights the ways in which Congress has both empowered and restricted the EEOC and discusses several key Supreme Court decisions that interpreted Title VII. Finally, Part I.C analyzes the EEOC's narrow rulemaking authority, and Part I.D examines the EEOC regulation—which lies at the heart of the circuit split—interpreting its investigatory power under Title VII.

## A. Creation of the EEOC and Subsequent Expansions of Authority        TOP ↑

Congress created the EEOC when it enacted Title VII of the Civil Rights Act of 1964. The new agency was tasked with addressing employment discrimination on the basis of race, color, national origin, sex, or religion. [17]  The scope of this mission included both individual claims of discrimination as well as more systemic patterns.[18]

But despite the lofty antidiscrimination goals that animated the creation of the EEOC, Congress initially gave it very little power to police discrimination.[19]  As originally enacted, Title VII placed severe substantive and procedural limitations on the EEOC. While it could investigate wrongdoing and engage in conciliation efforts, it had no independent authority to bring lawsuits.[20]  In stark contrast, the bill that was originally introduced envisioned a version of the EEOC with broad adjudicatory and enforcement powers.[21]  But the need for political compromises to move the bill through the legislative process led to the removal of most of the EEOC's enforcement power.[22]  The only tools Congress left the EEOC were processing complaints, attempting to foster conciliation, and recommending civil action to the attorney general if it found evidence of a pattern or practice of employment discrimination.[23]  Thus, Title VII's original statutory scheme left the power to resolve claims in the hands of courts via lawsuits brought by individuals and the Department of Justice.[24]

Congress substantially expanded the EEOC's powers with the Equal Employment Opportunity Act of 1972. [25]  Most importantly, the 1972 amendments to Title VII vested independent enforcement power in the EEOC, allowing it to bring lawsuits on behalf of individuals harmed by employment discrimination.[26]  The Act also extended Title VII to cover state and local employees, authorized appointment of an EEOC general counsel to conduct litigation under Title VII, and transferred authority to pursue pattern and practice litigation from the attorney general to the EEOC.[27]

The EEOC's powers continued to expand gradually over the next several decades. Six years after Congress passed the Equal Employment Opportunity Act of 1972, President Jimmy Carter signed an executive order[28] making the EEOC responsible for enforcing the Age Discrimination in Employment Act[29] (ADEA). Then, in

1990, Congress passed legislation placing the EEOC in charge of enforcing Title I of the Americans with Disabilities Act[30] (ADA). This final expansion of power consolidated the EEOC's authority to police all forms of employment discrimination proscribed by federal law.[31]

## B. Current EEOC Enforcement Procedure TOP ↑

The current enforcement process under Title VII consists of four stages: filing and notice of charge, investigation, conference and conciliation, and enforcement. Courts disagree over how to interpret the interaction between these stages, which has resulted in the circuit split at the heart of this Comment. While Parts II and III discuss this disagreement in more detail, this Section provides an overview of the EEOC's enforcement process as it is currently enumerated in Title VII.[32]

### 1. Filing and notice of charge.

EEOC involvement begins when an aggrieved individual, a person acting on behalf of an aggrieved individual, or an EEOC commissioner files a formal charge of unlawful employment discrimination with the agency.[33] This step triggers the EEOC's authority and is significant because aggrieved individuals cannot pursue private legal action until first exhausting the administrative procedures and receiving a right-to-sue notice from the EEOC.[34] The individual must file her charge with the EEOC within 180 days of the alleged unlawful employment practice.[35] Within ten days of the charge being filed, the EEOC is required to "serve a notice of the charge" on the employer or entity against whom the charge was filed.[36]

Two aspects of the structure Congress established for triggering EEOC authority are worth emphasizing. First, the dual mechanism by which charges can be filed reflects the "dual role" of the EEOC, which "requires it to wear both the hat of the individual and that of the government."[37] In other words, the EEOC is tasked with acting as a clearinghouse to evaluate and vindicate individual claims of employment discrimination for individual victims, but it is also responsible for addressing more widespread and systemic patterns and practices of discrimination. Commissioner's charges typically are used only to address systemic issues.[38] Individual claims, on the other hand, can—and often do—implicate both of these goals.[39] In such instances, the EEOC faces the difficult challenge of balancing the interests of the individual in vindicating her claim against the agency's overriding interest in protecting society writ large by eradicating impermissible employment practices for good.[40]

Second, the filing requirement under Title VII places a significant restriction on the EEOC's power. Indeed, the Supreme Court has rejected EEOC attempts to address alleged discrimination prior to the filing of a charge, holding that the existence of a valid charge is "a jurisdictional prerequisite" to EEOC authority.[41] Thus, unlike many other administrative agencies that enjoy broad power to investigate and enforce on their own initiative, the EEOC "does not possess plenary authority to demand information" from employers absent a charge.[42] In theory, this limitation poses no more than a minor hurdle because the EEOC has the ability to issue a commissioner's charge if it suspects unlawful employment practices may be occurring, thereby triggering its authority under Title VII.[43] But in practice, commissioner's charges are rarely used.[44]

### 2. Investigation.

Once a charge is filed and the employer is notified, Title VII requires the EEOC to "make an investigation thereof" to determine whether the charge is supported by sufficient evidence.[45] The EEOC must complete its investigation "as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge."[46] Although this language would seem to restrict the amount of time the EEOC can investigate, the Supreme Court refuses to interpret Title VII as placing a strict time limit on EEOC investigations.[47] Similarly, the Supreme Court has adopted a very broad reading of the EEOC's subpoena powers under Title VII. Although the EEOC is entitled only to evidence that is "relevant to the charge under investigation,"[48] the Supreme Court has construed the term "relevant" very "generously," allowing the EEOC to obtain "virtually any material that might cast light on the allegations against the employer."[49]

If the EEOC investigation does not find sufficient evidence of a violation to constitute reasonable cause, it must dismiss the charge and notify the parties of its determination.[50] After receiving notice of the EEOC's determination, the aggrieved party retains the right to file a private civil action against the employer.[51] In practice, the EEOC often will contact the individual before announcing that the investigation revealed insufficient evidence to find cause.[52] This advance warning allows the individual to request a right-to-sue notice before the EEOC issues its determination, thereby preventing publication of the EEOC's findings. From the individual's perspective, this is desirable: since the investigation did not find cause, the employer could have interpreted the EEOC's determination as a sign that the employee's case is weak, which the employer could then use against the individual in subsequent litigation or settlement negotiations.[53]

## 3. Conference and conciliation.

If the EEOC does find sufficient evidence to support the individual's claim, it must attempt "to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."[54] In fact, Title VII imposes a thirty-day period after the charge is filed during which legal action is prohibited, leaving informal methods of conciliation and persuasion as the only tools available during that time.[55]

Conference and conciliation—an informal and confidential process in which the EEOC works with the parties to find a voluntary resolution[56] —is the heart of the Title VII enforcement regime.[57] Courts have repeatedly noted that "Congress chose cooperation and voluntary compliance as its preferred means" to eliminate employment discrimination.[58] To encourage open and honest conciliation efforts from parties on both sides, Congress required that all informal proceedings remain confidential and imposed punishments for any violations.[59] It is only after informal means have failed that the EEOC can consider initiating legal action.[60] Still, the EEOC has "extensive discretion to determine the kind and amount" of conciliation efforts that are sufficient to satisfy the statutory mandate.[61]

## 4. Enforcement.

If the EEOC finds cause to support the claim and is unable to resolve the issue through conciliation, it has the option to bring a civil action against the employer or allow the aggrieved individual to do so on her own.[62] If the EEOC initiates an individual lawsuit, it seeks redress on behalf of the charging individual.[63] But because charges often implicate broader systemic concerns, the EEOC also uses litigation based on individual charges to further the public interest in rooting out and eliminating discriminatory employment practices, which gives rise to potential conflicts between the EEOC's dueling roles.[64] To alleviate this concern, Congress gave aggrieved individuals a statutory right to intervene in suits brought by the EEOC.[65] Congress also provided a mechanism for the aggrieved individual to sue on her own if the EEOC finds sufficient evidence but decides not to pursue legal action. When this situation arises, typically due to agency resource constraints, the charging individual can bring a private civil action after requesting and receiving a right-to-sue notice from the EEOC.[66] When an individual files a lawsuit pursuant to a right-to-sue notice, the EEOC can intervene only at the court's discretion.[67]

Title VII also allows the charging individual to demand a right-to-sue notice if the EEOC fails to complete its investigation within 180 days of the filing of the charge.[68] This mechanism arose out of Congress's concern that "the heavy caseload of the EEOC could result in delays unacceptable to aggrieved persons."[69] The 180-day limitation prevents unreasonable delays by allowing an aggrieved individual to bypass the agency's backlog by taking the information from the EEOC's investigation and pursuing legal action on her own.

But this private action mechanism does not supplant the EEOC's authority to bring a suit. The Supreme Court established this point firmly in *Occidental Life Insurance Co of California v Equal Employment Opportunity Commission*,[70] a leading case interpreting the EEOC's enforcement authority. The dispute in *Occidental* arose when the EEOC brought a lawsuit three years after the charge was filed and five months after conciliation efforts broke down.[71] The employer challenged the EEOC's authority to bring a lawsuit after

such long delays, arguing that Title VII should be read to impose a 180-day limitation on the EEOC's power to bring a suit. The Court rejected this interpretation, noting that "neither [§] 706(f) nor any other section of the Act explicitly requires the EEOC to conclude its conciliation efforts and bring an enforcement suit within any maximum period of time."[72] The Court has continued to build on *Occidental*'s broad view of EEOC enforcement powers in subsequent cases.[73]

## C. EEOC Rulemaking Authority TOP ↑

Under Title VII, the EEOC can only "issue, amend, or rescind suitable procedural regulations" necessary to carry out the statute.[74] The Supreme Court has interpreted Congress's restrictive delegation of rulemaking authority to mean that the EEOC lacks power to issue substantive rules and has struck down the EEOC's attempts to interpret Title VII's substantive provisions.[75] By contrast, the Supreme Court has been willing to uphold the EEOC's procedural regulations in several cases.[76]

This distinction is centrally important to this Comment because it raises questions about what constitutes procedure as opposed to substance in the Title VII context[77] and how much deference courts should give to the EEOC's rules concerning the former. As Part III.A discusses, courts will defer to an administrative agency's interpretation of an ambiguous statute under *Chevron* if the agency's interpretation is reasonable and adopted through a valid regulation carrying the force of law.

## D. The EEOC's Interpretation of Its Investigatory Powers TOP ↑

In 1974, the EEOC promulgated a final regulation following notice-and-comment rulemaking, 29 CFR § 1601.28(a)(3), authorizing it to continue investigating a charge even after issuing a right-to-sue notice to the aggrieved individual. Although continued investigations after the issuance of a right-to-sue notice are not meant to be the norm, § 1601.28(a)(3) reflects the EEOC's view that investigations should remain open when it serves the purposes of Title VII. The regulation states:

> Issuance of a notice of right to sue shall terminate further proceeding of any charge that is not a Commissioner charge unless . . . [specified EEOC officials] determine[ ] at that time or at a later time that it would effectuate the purpose of title VII, the ADA, or GINA [Genetic Information Nondiscrimination Act] to further process the charge. Issuance of a notice of right to sue shall not terminate the processing of a Commissioner charge.[78]

The EEOC's interpretation of Title VII, as embodied in § 1601.28(a)(3), is the lynchpin to the issues raised in this Comment. If the regulation is entitled to *Chevron* deference, that resolves the circuit split discussed in Part II. And given that the EEOC is permitted to engage in rulemaking only on procedural issues,[79] the EEOC's position deserves *Chevron* deference only if § 1601.28(a)(3) is procedural. But curiously, the courts that have considered whether the issuance of a right-to-sue notice terminates the EEOC's investigatory powers have not directly discussed these questions. The next Part explores why.

## II. Controversy over Post–Right-to-sue Notice Investigations: EEOC Treatment in the Courts of Appeals TOP ↑

Several circuit courts have come to different conclusions regarding whether the EEOC can continue to investigate a charge of discrimination after it issues a right-to-sue notice to the aggrieved individual. This Part analyzes each of the three cases that form this circuit split and begins to relocate the debate to address the important administrative law question that the courts so far have neglected: whether the EEOC's interpretation of Title VII, as expressed in § 1601.28(a)(3), is entitled to *Chevron* deference.

## A. The Fifth Circuit and Hearst TOP ↑

In *Equal Employment Opportunity Commission v Hearst Corp*,[80] the Fifth Circuit held that the EEOC's authority to investigate terminates when it issues a right-to-sue letter. The issue in *Hearst* arose after two employees of the Houston Chronicle filed a charge with the EEOC against the company's vice president of sales and marketing alleging sexual harassment and discrimination.[81] The EEOC began to investigate the claims, but the aggrieved individuals requested a right-to-sue notice before the investigation concluded.[82] The EEOC granted the plaintiffs' right-to-sue notices but refused to withdraw subpoenas it had previously issued demanding documents from the company.[83] The Chronicle's parent company, the Hearst Corporation, refused to comply with the subpoenas, and the EEOC sued in federal district court to have them enforced.[84] The district court enforced the subpoenas and ordered Hearst to turn over its documents, but the Fifth Circuit reversed on appeal.[85]

The Fifth Circuit's analysis drew heavily on the language from the Supreme Court's decision in *Occidental*. After lamenting the fact that *Occidental* rendered Title VII's "180-day period . . . practically meaningless,"[86] the court went on to emphasize that, in *Occidental*, the Supreme Court described the enforcement procedure under Title VII as a "multistage scheme" involving "a sequential series of steps"[87] that fall "into four distinct stages: filing and notice of charge, investigation, conference and conciliation, and finally, enforcement."[88] The Fifth Circuit took this to mean that Congress "deliberately divided [Title VII's enforcement procedure] into distinct stages" that should be completed one after the other in a nonoverlapping series.[89] And although the court acknowledged that "Congress granted the EEOC broad investigatory authority,"[90] it held that such power was strictly confined within the investigation stage. In other words, the court said that once the EEOC issues a right-to-sue notice, "the time for investigation has passed."[91] At that point, the EEOC can only "intervene [in the individual's lawsuit] and pursue discovery through the courts" or "file a Commissioner's charge."[92]

In addition to the Supreme Court's language from *Occidental*, the Fifth Circuit claimed that its position was "confirmed by the legislative history of the 1972 amendments" to Title VII.[93] Quoting snippets from the Congressional Record, the court stated that:

> A Senate Conference Report indicates that the amendments retained the previous structure that "enable[d] the EEOC to process a charge of employment discrimination through the investigation and conciliation stages," but additionally authorized the EEOC to go further and file a civil action "if it has been unable to eliminate an alleged unlawful employment practice by informal methods."[94]

The court did not cite any other legislative history to support its interpretation. And although the court did parse the statutory text earlier in its opinion, that analysis focused on Title VII's 180-day limit rather than on how a right-to-sue notice impacts the EEOC's investigatory authority.[95] The court's misplaced focus—and the fact that the Fifth Circuit's interpretation directly contradicted established Supreme Court precedent[96] — undercuts the force of its statutory analysis.

Curiously, the *Hearst* court did not cite § 1601.28(a)(3) and failed to discuss whether the EEOC's interpretation merits any level of deference.[97] As Part III discusses, the only justification for this omission would be if the text of Title VII were unambiguous, thereby leaving no room for agency interpretation.[98] But the Fifth Circuit did not explicitly make that ruling. Instead, the court seems to have implicitly held that the text of Title VII unambiguously prohibits the EEOC from continuing its investigation after issuing a right-to-sue notice. Without more textual support, the conclusion that Congress intended "distinct" stages of Title VII enforcement is not obvious.

## B. The Ninth Circuit and Federal Express TOP ↑

More than a decade later, the Ninth Circuit rejected the Fifth Circuit's conclusion and created a circuit split when it decided *Equal Employment Opportunity Commission v Federal Express Corp*.[99] In *Federal Express*, a FedEx employee filed a claim on behalf of himself and similarly situated minority employees alleging racial discrimination in the company's promotion and career advancement practices.[100] Like in *Hearst*, the EEOC granted the plaintiff a right-to-sue notice but continued its investigation.[101] As part of its investigation, the EEOC issued subpoenas to FedEx and tried to have them enforced in federal district court after FedEx refused to comply.[102] The district court sided with the EEOC, just as the district court did in *Hearst*.[103] But this time, the court of appeals affirmed the decision.[104]

In affirming the lower court, the Ninth Circuit adopted a different approach to judicial review in EEOC subpoena enforcement cases than the Fifth Circuit. The court held that judicial inquiry in such cases should be "quite narrow" and consider "(1) whether Congress has granted the authority to investigate" and "(2) whether procedural requirements have been followed."[105] Given the "strictly limited role" for courts in reviewing agency subpoena requests,[106] the Ninth Circuit said that the first factor is satisfied as long as the EEOC has "a plausible basis for jurisdiction."[107] Turning to the second factor, the court discussed the enforcement procedures laid out in Title VII and emphasized that the EEOC's interpretation of § 1601.28(a)(3) allowed it to continue investigating after issuing a right-to-sue notice.[108] This interpretation controlled, the court said, because it was not "plainly erroneous or inconsistent with the regulation."[109] Note, however, that the court considered only the permissibility of the agency's interpretation of § 1601.28(a)(3) and not its interpretation of Title VII.

The Ninth Circuit then addressed and explicitly rejected the Fifth Circuit's reading of Title VII on several different grounds. First, the court rejected the rigid boundaries the Fifth Circuit erected between the various stages of enforcement. Rather than a series of "distinct" stages, the Ninth Circuit said they were "integrated" such that "[t]he fact that one stage of the enforcement procedure is going on does not mean that another stage has ceased."[110] In support, the court cited the Supreme Court's holding that Title VII gives the EEOC "a broad right of access to relevant evidence" to enable it "to make informed decisions at each stage of the enforcement process."[111] Second, the Ninth Circuit chafed at the notion that "the charging party can, through his or her actions (that is, by filing suit), divest the EEOC of authority."[112] Instead, the court noted that the Supreme Court had declared the EEOC the "master of its own case," meaning the EEOC controls the enforcement process regardless of what the aggrieved individual does.[113] Finally, the court countered the Fifth Circuit's contention that EEOC investigations no longer serve the purpose of Title VII after the charging individual files suit. This view, the Ninth Circuit held, ignores the fact that EEOC investigations serve a purpose beyond redressing individual harms: "The EEOC is not merely a proxy for victims of discrimination, but acts also to vindicate the public interest in preventing employment discrimination."[114] The Ninth Circuit held that this broader purpose could, under certain circumstances, necessitate that the EEOC continue an investigation even after the charging party files suit.[115]

While the Ninth Circuit's opinion addressed some of the gaps left by *Hearst*, it still suffers from a major omission. The court correctly noted that courts should defer to an agency's interpretation of its own regulation,[116] but that question has no bearing on whether courts should defer to the agency's interpretation of the statute. By failing to address the latter question, the Ninth Circuit in *Federal Express* did not adequately address the issue of deference to administrative agencies, just like the Fifth Circuit in *Hearst*.[117]

## C. The Seventh Circuit and Union Pacific TOP ↑

The Seventh Circuit recently adopted the Ninth Circuit's approach in *Equal Employment Opportunity Commission v Union Pacific Railroad Co*.[118] This case arose from allegations of racial discrimination that two employees filed against Union Pacific after they were denied the opportunity to take tests required for promotion.[119] After various procedural maneuverings, the EEOC issued right-to-sue notices to the aggrieved

individuals who then brought a private suit.[120]  The EEOC meanwhile continued its own investigation to determine whether other individuals had been affected by Union Pacific's alleged discriminatory practices.[121]  Eventually, the district court dismissed the individuals' claims, and Union Pacific challenged the EEOC's ongoing efforts to enforce its subpoenas.[122]  The district court rejected Union Pacific's motion to dismiss, and the Seventh Circuit affirmed.[123]

The Seventh Circuit began its analysis with the text of Title VII. Parsing the relevant language, the court first noted that "[t]he requirements of the statute itself are minimal."[124]  It then echoed the Ninth Circuit in holding that, "while a valid charge is a requirement for beginning an EEOC investigation, nothing in Title VII supports a ruling that the EEOC's authority is then limited by the actions of the charging individual."[125]

Like the Ninth Circuit, the Seventh Circuit emphasized precedent suggesting that the EEOC's enforcement authority exists wholly separate from whether individuals pursue private lawsuits. In particular, the court focused on the Supreme Court's decision in *Equal Employment Opportunity Commission v Waffle House, Inc*,[126] which held that "[t]he statute clearly makes the EEOC the master of its case and confers on the agency the authority to evaluate the strength of the public interest at stake."[127]  The court also discussed a Seventh Circuit decision, *Equal Employment Opportunity Commission v Watkins Motor Lines, Inc*,[128] in which the court held that the EEOC can continue its investigation even after the aggrieved individual withdraws the charge she filed with the EEOC.[129]  To hold otherwise, the court said, would be "to limit the EEOC's investigation to the decisions made by the charging individuals . . . [and] needlessly inhibit its ability to conduct 'a pattern-or-practice investigation that might lead to relief for many persons in addition to [the charging individual].'"[130]

Like the courts in *Hearst* and *Federal Express*, the Seventh Circuit in *Union Pacific* did not fully address the question of agency deference. But the Seventh Circuit did mention the deference issue in a footnote acknowledging that Union Pacific had "challenge[d] whether [§ 1601.28(a)(3)] is entitled to *Chevron* deference based on its contrary construction of Title VII."[131]  But rather than analyze the issue fully, the court quickly dismissed it. Like the Ninth Circuit, the Seventh Circuit held that "[t]he EEOC's interpretation of its own rules is entitled to deference,"[132] and at any rate, "since the court has already rejected Union Pacific's construction, this challenge completely fails to get off the ground."[133]  Thus, the Seventh Circuit also implicitly accepted the validity of § 1601.28(a)(3) without further examination.

\* \* \*

All three courts in this circuit split seem to think the text of Title VII unambiguously supports the decisions they reach. While there are colorable arguments to be made on both sides of the debate, the better interpretation is that the conflict between *Federal Express* and *Union Pacific* on the one hand and *Hearst* on the other indicates statutory ambiguity.[134]  To resolve this ambiguity, and thus the circuit split, Part III analyzes what the Fifth, Seventh, and Ninth Circuits ignored: the doctrine of judicial deference to administrative agencies.

# III. Justifying the EEOC's Authority to Investigate after Issuing <span>TOP ↑</span> a Right-to-sue Notice

The Seventh and Ninth Circuits split from the Fifth Circuit over whether the EEOC can continue to investigate a charge of discrimination after it issues a right-to-sue notice. Despite their varied holdings, one commonality is their consistent failure to address whether § 1601.28(a)(3) is entitled to *Chevron* deference. While the Fifth Circuit ignored the regulation's existence altogether, the Seventh and Ninth Circuits tacitly accepted its validity without much analysis. This puzzling result deserves examination.

One likely explanation for the circuit courts' consistent failure to apply a formal deference regime is that Supreme Court precedent regarding judicial deference to the EEOC is uncertain.[135] Although the Supreme Court has employed *Chevron*-like reasoning in several cases involving EEOC procedural regulations, it has never stated that full *Chevron* analysis is required.[136] Given the lack of a clear pronouncement, it is perhaps unsurprising that a circuit split has emerged.

But this uncertainty does not by any means prove that *Chevron* deference is inappropriate in cases involving the EEOC. The Supreme Court's inconsistent application of deference analysis is well-documented and, as Professor William Eskridge Jr and Lauren Baer show, it is widespread.[137] Far from being unique to the EEOC, the Supreme Court more often than not eschews formal deference regimes in favor of ad hoc reasoning in the vein of traditional statutory interpretation.[138] Eskridge and Baer posit several reasons why this might be the case, but ultimately, their empirical results do not "offer guidance as to why named deference regimes are applied to some cases and not others."[139] The authors nonetheless argue that the deference regimes have continued value and should not be abandoned.[140] Whatever the reason for the courts' failure to address the deference question, this Comment establishes that applying a formal deference regime is appropriate here.

This Part addresses the unresolved questions and fills the analytical gaps left by the circuit courts to resolve the circuit split. The analysis in Part III.A shows that § 1601.28(a)(3) is a valid and reasonable procedural rule that merits deference under the *Chevron* framework.[141] Part III.B then shows that the EEOC's practice of investigating after issuing a right-to-sue notice promotes the purpose and goals of Title VII and conforms with Supreme Court precedent on closely related topics of EEOC enforcement power.

## A. The EEOC's Interpretation of Title VII in 29 CFR § 1601.28(a)(3) TOP ↑ Deserves Deference

The Supreme Court's jurisprudence has not definitively answered the question of how much deference courts should afford the EEOC's interpretations of Title VII.[142] Indeed, the Court often has avoided this question, opting instead to decide cases without addressing deference.[143] When the Court has tackled the deference question in the EEOC context, it has applied the less deferential standard laid out in *Skidmore v Swift & Co*[144] more often than the more deferential regime described in *Chevron*.[145] Despite this trend in past cases, the following analysis shows that courts should give § 1601.28(a)(3) deference under *Chevron*.

This Section proceeds as follows: First, Part III.A.1 provides an overview of the doctrine of judicial deference. Part III.A.2 and Part III.A.3 then argue from a macro perspective that, in general, there is no categorical bar to applying *Chevron* deference to EEOC regulations. Finally, Part III.A.4 and Part III.A.5 shift to a micro perspective to show that *Chevron* deference is appropriate with regard to § 1601.28(a)(3) in particular.

### 1. Judicial deference to administrative agencies: a theoretical overview.

Which deference regime courts apply can have a profound impact on the outcome of a case because the two standards—referred to as *Skidmore* deference and *Chevron* deference—differ considerably.[146] Under the *Skidmore* standard, courts are less deferential to agency interpretations. While the agency's "rulings, interpretations and opinions . . . constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," they are not binding.[147] Courts are free to substitute their own interpretation for the agency's after considering "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[148]

By contrast, the higher level of deference under *Chevron* requires courts to engage in a two-step analysis. In Step One, courts ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter."[149] However, "if the statute is silent or ambiguous with respect

to the specific issue," then courts move on to Step Two, which asks "whether the agency's answer is based on a permissible construction of the statute."[150]  In other words, Step Two asks whether the agency's interpretation is reasonable. As long as it is, courts defer to the agency's view even if they think a different interpretation might be better.[151]

Determining which standard to apply is a complicated matter that has sparked rigorous debate between Supreme Court justices.[152]  In answering this question, courts now commonly apply what is known as *Chevron* Step Zero. This analysis asks whether Congress intended to give the agency authority to interpret the statute in question. If the answer is yes, the court moves on to the two-step *Chevron* analysis. If the answer is no, the court instead applies the less deferential *Skidmore* standard.[153]  *Chevron* Step Zero thus provides a gatekeeping function to determine whether courts reach the *Chevron* analysis at all.

The Supreme Court has developed two sets of factors to consider at the Step Zero inquiry. The first set comes from *United States v Mead Corp.*[154]  Under *Mead*, the key inquiry is whether "Congress delegated authority to the agency generally to make rules carrying the force of law" and whether the agency acted pursuant to that authority.[155]  The most important factor in this analysis is whether Congress authorized the agency to engage in formal rulemaking or adjudication, or informal rulemaking pursuant to notice-and-comment procedures. [156]  But the *Mead* Court made clear that formal agency action and notice-and-comment procedures are not prerequisites for *Chevron* deference.[157]  Other factors like the language of the statute, how many parties are bound by the agency interpretation, the precedential value of the interpretation, and the number of interpretations the agency issues also can indicate congressional intent.[158]

The second set of factors comes from *Barnhart v Walton.*[159]  In upholding an agency regulation that had been issued through informal means, the *Barnhart* Court said that Step Zero turned in large part on "the interpretive method used and the nature of the question at issue."[160]  The factors in this inquiry, the Court said, include "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration," how carefully the agency has considered the question, and for how long a period.[161]

## 2. Judicial deference to EEOC procedural regulations: the experience in practice.

The Supreme Court has not articulated a clear theory of deference to EEOC regulations under Title VII.[162]  It is well established that EEOC regulations that interpret the substance of Title VII never merit *Chevron* deference because, under Title VII, the EEOC has authority only to issue procedural regulations.[163]  But despite the Court's hostility to EEOC regulations interpreting the substance of Title VII, the Court has shown willingness to defer to the EEOC's procedural regulations. In *Equal Employment Opportunity Commission v Commercial Office Products Co*[164]  and *Edelman v Lynchburg College,*[165]  for example, majorities of the Court applied logic resembling that of *Chevron* to uphold EEOC interpretations of Title VII, and concurring opinions in both cases advocated explicitly for *Chevron* deference.[166]

The Court's analysis in *Commercial Office* closely mirrored that of *Chevron*. The dispute in *Commercial Office* concerned the EEOC's interpretation that, under Title VII, a state antidiscrimination agency "terminated" its proceedings when it waived its right to initially process a charge of discrimination.[167]  After finding that the language of Title VII was ambiguous, the Court held that the EEOC's interpretation was not only reasonable, but also "more than amply supported by the legislative history of the deferral provisions of Title VII, the purposes of those provisions, and the language of other sections of the Act."[168]

The Court also upheld a procedural regulation in *Edelman*. At issue was an EEOC regulation allowing individuals to amend their charge to add the required verification by oath or affirmation after the filing period had expired.[169]  As long as the initial charge was timely filed, the EEOC regulation provided that the verification would relate back to the time of the original filing.[170]  Writing for the *Edelman* Court, Justice David Souter rejected the employer's argument that the EEOC's regulation unlawfully altered the substantive

requirements Congress laid out in Title VII. Drawing a distinction between procedure and substance,[171] the Court held that the relevant statutory provision was ambiguous and "open to interpretation"[172] and that the EEOC did not exceed "its authority to adopt 'suitable procedural regulations'" under 42 USC § 2000e-12(a).[173] The Court then moved to the second issue: what level of deference to give to the EEOC regulation. The Court initially invoked *Mead*'s principle that *Chevron* does not always require formal agency action or notice-and-comment procedures.[174] But rather than pursue the inquiry further, the Court abruptly announced that there was "no need to resolve any question of deference" because it found "the EEOC rule not only a reasonable one, but the position we would adopt even if there were no formal rule and we were interpreting the statute from scratch."[175]

While the majorities in *Commercial Office* and *Edelman* implicitly support the view that the EEOC's procedural regulations merit high deference from courts, Justice Sandra Day O'Connor's concurrences in both cases make the case explicitly. In *Commercial Office*, O'Connor agreed with the majority that, "in light of the statute's language, structure, and legislative history, sufficient ambiguity exists to warrant deference to the agency's construction of the word 'terminated' in § 706(c) [of Title VII]. Indeed, deference is particularly appropriate on this type of technical issue of agency procedure."[176] O'Connor was even more explicit in *Edelman*: "I do not agree that the EEOC has adopted the most natural interpretation of Title VII's provisions regarding the filing with the EEOC of charges of discrimination. . . . But, because the statute is at least somewhat ambiguous, I would defer to the agency's interpretation."[177] In support, O'Connor cited *Chevron* as well as her concurrence in *Commercial Office*.[178]

### 3. EEOC procedural regulations can merit *Chevron* deference.

The structure of Title VII and relevant precedent show that, in the abstract, EEOC procedural regulations that interpret Title VII merit *Chevron* deference. As Part III.A.1 discusses, an agency interpretation merits *Chevron* deference only if it satisfies Step Zero,[179] which asks whether Congress delegated authority to the agency to make rules carrying the force of law and whether the agency interpretation claiming deference was issued as an exercise of that authority.[180] It is an open question whether the EEOC has such authority under Title VII, as the previous Section demonstrates, but several Supreme Court cases suggest that it does with regard to its procedural rules.[181] Likewise, several scholars and lower courts have provided convincing analyses demonstrating that EEOC procedural regulations can carry the force of law.[182]

Professor Rebecca Hanner White argues persuasively that, although the EEOC's lack of substantive rulemaking or adjudicatory authority is "dispositive" as to whether the EEOC can interpret substantive rules, it is not so with regard to its procedural ones.[183] Channeling the logic of the *Barnhart* factors, White argues that properly answering whether Congress meant to delegate the power to create rules with the force of law requires a consideration of the full weight of evidence, including the legislative record and "other factors generally regarded as useful,"[184] to determine whether it "makes sense" within the overall statutory scheme for the EEOC to have such power.[185] These factors cut strongly in favor of judicial deference to the EEOC's procedural rules. First, White traces Title VII's legislative history to show that, unlike other elements of the statute that were more contentious, the question of EEOC rulemaking authority "has never been the object of sustained congressional debate."[186] The debates on those other issues—for example, the EEOC's ability to initiate a lawsuit—resulted in the various restrictions Congress placed on the EEOC's enforcement powers.[187] By comparison, White argues that "one would have expected some debate" if Congress had intended to limit the EEOC's interpretative powers as well.[188] Deferring to the EEOC's interpretation also satisfies the *Barnhart* factor favoring a uniform system in an important area of law and incorporates EEOC expertise that is "unmatched by the courts."[189]

Moreover, the enforcement powers Congress enumerated in Title VII "necessarily envisioned the need for agency interpretation."[190] Title VII essentially consists of three major elements: (1) Congress's substantive notions about what constitutes employment discrimination,[191] (2) a broad framework for how the enforcement procedure should operate,[192] and (3) a residual clause allowing the EEOC to issue procedural

rules necessary to carry out the broad purposes of the statute.[193] In other words, Congress specifically dictated the *what* of employment discrimination, but it largely left the *how* up to the EEOC, provided the agency stays within Title VII's broad framework. By vesting the EEOC with broad investigatory power, a duty to attempt conciliation, and, finally, a direct prosecutorial role in antidiscrimination lawsuits, Congress impliedly granted the EEOC the authority to interpret the statute and determine how best to fulfill each role. Otherwise, "the EEOC's views of what the statute means are without force," and its enforcement efforts "become[ ] perfunctory until the courts resolve the statutory issue."[194] The interpretations embodied in the EEOC's procedural regulations therefore further satisfy Step Zero under *Barnhart* because they are necessary to answer the interstitial questions that arise in the daily administration of the statute.[195]

Arguments that the EEOC's regulations *always* fail Step Zero are unpersuasive. Authors taking this position sometimes argue that courts historically have shown less deference to the EEOC than to other agencies.[196] From this premise, they assert that because courts typically apply *Skidmore* deference to EEOC regulations, that must be the proper standard.[197] But this argument is conclusory and ignores the endogeneity of the procedure-substance issue within those cases. Indeed, in *General Electric Co v Gilbert*[198] and *Equal Employment Opportunity Commission v Arabian American Oil Co*[199] —two cases that proponents of this argument often cite—the Court struck down EEOC interpretations because they reached the substance of Title VII. These cases therefore shed little light on how courts should treat the EEOC's procedural rules.[200]

Professor Nancy Modesitt falls into a similar trap. She claims that "even the EEOC's interpretations of Title VII created using formal procedures are entitled to, at most, *Skidmore* deference, not *Chevron* deference,"[201] because "Congress did not 'give[ ] rulemaking authority to interpret the substantive provisions of Title VII.'"[202] Puzzlingly, Modesitt cites *Edelman* to support this claim. But as the previous Section analyzed,[203] rather than condemning all EEOC interpretations, the Court in *Edelman* distinguished "suitable procedural regulations" from "substantive issue[s] over which the EEOC has no rulemaking power."[204] In drawing this distinction, the Court strongly implied its favorable view of the former category.

The great weight of evidence shows that the EEOC's procedural rules issued pursuant to 42 USC § 2000e-12 can be entitled to deference. Although the rulemaking power Congress granted the EEOC falls decidedly short of conventional substantive legislative rules, the EEOC's procedural rules nonetheless are "rule[s] within the agency's special ken and competence, as recognized by Congress in its organic statute."[205] Analyzing the Step Zero factors demonstrates that Congress impliedly delegated interpretative authority to the EEOC to facilitate its broad enforcement powers under Title VII.

## 4. Applying *Chevron* Step Zero to 29 CFR § 1601.28(a)(3).

While the previous Sections establish that, in general, EEOC procedural regulations can merit *Chevron* deference, this Section shows that § 1601.28(a)(3) in particular satisfies Step Zero because it is a procedural regulation that carries the force of law.[206]

Several factors from *Mead* and *Barnhart* show that § 1601.28(a)(3) carries the force of law. First, and most importantly, § 1601.28(a)(3) was adopted via notice-and-comment procedures pursuant to its explicit authority to adopt procedural rules.[207] On its face, this fact alone may satisfy Step Zero under *Mead* because such rulemaking shows that Congress delegated the authority to make rules carrying the force of law, and the EEOC acted on this authority.[208] Looking to *Barnhart*, § 1601.28(a)(3) also represents a longstanding interpretation that has remained in place since the EEOC promulgated the regulation in 1974,[209] and the determination of when a continued investigation serves the purposes of Title VII draws considerably on the EEOC's particularized expertise.[210] These factors suggest that this question is well suited for *Chevron* analysis.[211] Moreover, the regulation simply states that the EEOC can continue investigating a charge of employment discrimination as long as it "effectuate[s] the purpose of title VII."[212] It does not purport to interpret what constitutes an unlawful employment practice, nor does it attempt to change the substantive obligations imposed by Title VII. Instead, it addresses interstitial questions regarding the EEOC's internal functioning.[213]

Courts' treatment of other EEOC interpretations confirms the procedural nature of § 1601.28(a)(3). In *General Electric*, the Supreme Court rejected EEOC guidelines that sought to bring discrimination on the basis of pregnancy and childbirth within the purview of sex discrimination under Title VII.[214]  Similarly, in *Arabian American Oil*, the Court rebuffed the EEOC's interpretation that Title VII's jurisdiction extended to employers outside the United States.[215]  Both of these cases dealt with EEOC interpretations that went to the substance of Title VII. In sharp contrast, the Court upheld the EEOC's procedural interpretations in *Commercial Office* and *Edelman*, which respectively addressed when a state antidiscrimination agency "terminated" its proceedings and whether an aggrieved individual's amended charge could relate back to the date the initial charge was filed.[216]  These two pairs of cases highlight a key distinction that runs through the Court's jurisprudence: EEOC interpretations regarding *what* it can enforce are impermissibly substantive, while interpretations of *how* it can enforce are procedural. Section 1601.28(a)(3) falls in the latter category and is far more similar to the procedural regulations upheld in *Commercial Office* and *Edelman*.[217]

Opponents of this view might counter that § 1601.28(a)(3) is not actually procedural because the EEOC's decision to investigate can significantly impact rights and obligations under Title VII. This argument is as incorrect as it is unconvincing. Legal scholarship firmly recognizes that procedural rules inherently impact substantive outcomes.[218]  The EEOC's decisions to continue an investigation pursuant to § 1601.28(a)(3) are no exception. But the mere existence of a downstream impact on substance is not sufficient to invalidate an otherwise permissible procedural rule.[219]  Rather, the question should be one of degree: Does the procedural rule impact substance *too much*? Drawing this line can be difficult, especially when, as in the EEOC context, courts have not discussed the question at length.[220]  In this situation, comparison and analogy emerge as highly effective tools. And again, comparing § 1601.28(a)(3) with the decidedly procedural regulations upheld in *Commercial Office* and *Edelman* and the decidedly substantive regulations struck down in *General Electric* and *Arabian American Oil* confirms that § 1601.28(a)(3) falls on the procedural side of the line.

## 5. Applying *Chevron* analysis to 29 CFR § 1601.28(a)(3).

Since § 1601.28(a)(3) is procedural and satisfies Step Zero, it should be analyzed under the *Chevron* framework rather than the less deferential *Skidmore* regime.[221]  The inquiry thus moves to *Chevron*'s two-step analysis, which asks (1) whether the statute at issue clearly expresses Congress's intent and (2) whether the regulation is a reasonable interpretation of the statute. If the regulation fails at either step, it does not merit deference.

At Step One, courts draw on all tools of statutory interpretation, examining the statute's text, structure, and purpose; the legislative history; and subsequent legislative enactments.[222]  Starting with the text, nothing in Title VII explicitly answers whether the EEOC loses its authority to investigate once it issues a right-to-sue notice. One might interpret this silence to imply affirmative authorization since Title VII does restrict other aspects of EEOC enforcement.[223]  Indeed, both the Seventh and Ninth Circuits seem to have adopted the view that Title VII unambiguously empowered the EEOC to continue investigation after issuing a right-to-sue notice.[224]  But the better reading is that this silence reflects ambiguity, as demonstrated by the conflict between *Federal Express* and *Union Pacific* on the one hand and *Hearst* on the other. In *Hearst*, the Fifth Circuit correctly identified that Title VII contains time restrictions and jurisdictional triggers that collectively could suggest congressional desire to limit the EEOC's power. Yet neither the structure nor purpose of the statute suggest congressional intent to restrain the EEOC's investigations.[225]  To the contrary, the structure of Title VII's enforcement mechanism emphasizes that the EEOC's investigatory authority is broad in order to foster conciliation and avoid litigation.[226]

The legislative history is similarly indeterminate regarding the impact of right-to-sue notices. The legislative record does show that Congress intentionally restrained the EEOC's independent enforcement power by limiting its ability to bring civil actions and making an individual charge of discrimination a jurisdictional prerequisite to EEOC action.[227]  But there is no indication that Congress intended similar restraints on the EEOC's investigatory powers, and no provision speaks extensively about right-to-sue notices. Here, as in

*Chevron*, "the legislative history as a whole is silent on the precise issue," but it is "consistent with the view that the [agency] should have broad discretion."[228]  The fact that Congress steadily increased the EEOC's authority over time further supports this view.[229]  Ultimately, these arguments and counterarguments underscore Title VII's ambiguity.

Because the statute is ambiguous, satisfying Step One, the analysis finally turns to Step Two. Applying Step Two, the EEOC's interpretation is entitled to *Chevron* deference because § 1601.28(a)(3) is reasonable. *Chevron*'s reasonableness standard is similar to the substantive component of traditional arbitrary and capricious review.[230]  Here, the regulation is reasonable because it draws on agency expertise and falls within the broad discretion that Title VII and the Supreme Court have afforded the EEOC to investigate systemic employment discrimination.[231]  Given the text of Title VII and the EEOC's broad discretion to determine what serves the public interest, there is no blanket prohibition on post–right-to-sue notice investigations.[232]  Even if a court believes that a different interpretation is better than the EEOC's, that does not undermine the reasonableness of § 1601.28(a)(3).[233]

The sole other article that explicitly discusses this circuit split argues that § 1601.28(a)(3) fails at Step Two because it is arbitrary and capricious on two grounds. First, the authors—Shawn Twing and Travis Odom—claim that Congress "did not intend for the [EEOC's] investigation to go on indefinitely."[234]  Second, the authors argue that "the primary purpose of Title VII is to trigger the investigatory and conciliatory procedures . . . to achieve non-judicial resolution of employment discrimination claims" and that "[t]his purpose is not served at all by allowing the EEOC to continue investigating an employer on the basis of a charge already being litigated."[235]

Neither of these arguments is convincing. As to the first, the authors' concerns about a wholly unrestrained EEOC conducting never-ending investigations would be justified if those fears were realistic. But they are not. Section 1601.28(a)(3) allows the EEOC to investigate only so long as it "effectuate[s] the purpose" of Title VII.[236]  This key qualification provides employers with a ground to challenge—and courts with a means to police—an EEOC investigation that improperly extends beyond the issuance of a right-to-sue notice. Thus, even in the world this Comment envisions, employers retain meaningful checks to prevent overzealous EEOC officials from running amok.

Moreover, the Supreme Court has already made clear that there is no strict temporal limit on the EEOC's enforcement authority, despite the 180-day period described in the statute.[237]  Just as Title VII imposes no requirement that the EEOC "conclude its conciliation efforts and bring an enforcement suit within any maximum period of time,"[238]  it also should not be read to impose an arbitrary temporal cap on the EEOC's investigatory powers. This view is supported further by the fact that there is no time limit for commissioner's charges.

The second argument, that allowing the EEOC to continue investigating fails to promote extrajudicial resolution of disputes, also fails because it underestimates the EEOC's duty under Title VII to "vindicate the public interest in preventing employment discrimination."[239]  When an aggrieved individual brings a private civil action, she pursues her narrow self-interest, which is likely to diverge from that of the greater public. Despite Twing and Odom's assertion to the contrary,[240]  the EEOC still has a strong interest in completing its investigation to determine whether the employer has engaged in systemic or widespread patterns or practices of employment discrimination. Given its broader mission, the EEOC is better positioned to address such patterns or practices than an individual's lawsuit, which has a narrow scope limited to the parties involved. And in the long term, allowing EEOC investigations to continue could lead to less litigation overall—thereby satisfying the purpose of Title VII—because the EEOC could address the widespread discriminatory practices in one fell swoop, eliminating the need for redundant, time-consuming individual lawsuits filed by each affected employee.

Twing and Odom also fail to distinguish controlling Supreme Court precedent.[241] They try to mitigate the force of the Court's holding in *Waffle House* that Title VII "makes the EEOC the master of its own case."[242] But that decision should be read in conjunction with the Court's earlier statement in *Occidental* that nothing in Title VII requires the EEOC to conclude its enforcement efforts "within any maximum period of time."[243] Together, these holdings confirm the vast control the EEOC exercises over its enforcement procedures.

\* \* \*

On balance, the Step Zero factors and the *Chevron* analysis indicate that § 1601.28(a)(3) deserves *Chevron* deference. Congress explicitly gave the EEOC power to issue procedural rules and implicitly authorized those rules to fill the gaps and ambiguities left in Title VII's enforcement procedure. The EEOC did just that when it enacted § 1601.28(a)(3) via notice and comment. The EEOC's interpretation of Title VII does not conflict with the statute's text, it is a reasonable interpretation of Congress's intent, and it accomplishes the broad antidiscrimination goals enshrined in Title VII. As such, courts should defer to § 1601.28(a)(3) under *Chevron*.

## B. Continued EEOC Investigations Further the Purpose of Title VII    TOP ↑

Restricting the EEOC's ability to investigate is antithetical to the goals of Title VII because it would stifle conciliation efforts. The legislative history demonstrates Congress's intent that conciliation be the first and preferred tool used to rectify employment discrimination. And courts have repeatedly affirmed its centrality to the Title VII scheme.[244]

The Supreme Court recently reiterated the importance of conciliation in *Mach Mining, LLC v Equal Employment Opportunity Commission*.[245] In *Mach Mining*, the Court considered whether the conciliation efforts the EEOC conducted before bringing a civil action against the employer were sufficient to satisfy the requirements under Title VII.[246] In response, the EEOC argued that its conciliation efforts should not be subject to judicial review.[247] Although the Court recognized the "expansive discretion that Title VII gives to the EEOC" in pursuing conciliation efforts, it rejected the notion that courts could not review the EEOC's actions to ensure compliance with the requirements of Title VII.[248] In so holding, the Court emphasized that conciliation is "a key component of the statutory scheme"[249] and that "Congress chose '[c]ooperation and voluntary compliance' as its 'preferred means'" to eliminate employment discrimination.[250]

Because conciliation flows from the EEOC's investigation, limiting the EEOC's investigative power would cause practical difficulties that would undermine its antidiscrimination efforts. If the issuance of a right-to-sue notice terminates the EEOC's investigatory authority and a charging individual requests a right-to-sue notice before the EEOC finishes its investigation, the EEOC is left with few options, all of which are inadequate. Absent the results from a rich and full investigation, the EEOC would find it difficult to persuade a recalcitrant employer to accept satisfactory terms of conciliation. Terminating the EEOC's ability to investigate is therefore likely to push the EEOC prematurely toward more litigation. Worse, such a rule might compel the EEOC to drop enforcement on those charges altogether, greatly increasing the threat that discriminatory practices will go undiscovered and unchallenged. Either of these outcomes undermines the purpose of Title VII and should be avoided.

The alternative enforcement options the Fifth Circuit suggests in *Hearst* are not suitable replacements for the ability to conduct an investigation. In *Hearst*, the Fifth Circuit suggested that without the ability to investigate, the EEOC still would be able to file a commissioner's charge or intervene in the aggrieved individual's lawsuit.[251] But as the Seventh Circuit noted in *Union Pacific*, these alternatives present additional procedural hurdles that complicate enforcement. For example, "a Commissioner's charge filed after issuance of a notice of right-to-sue may be deemed untimely,"[252] especially if the investigation has been in progress for a substantial period of time. More significantly, commissioner's charges are rarely used and often wrapped up in politics.[253] EEOC commissioners are political appointees, nominated by the president and confirmed by the Senate to five-year terms.[254] And while Title VII guarantees rough partisan balance—of the five

commissioners, no more than three may be affiliated with the same political party[255] —that does not insulate commissioners from political influence. History shows that Congress has been willing to pull the purse strings closed or refuse to confirm a nominee when it disapproves of the agency's activities.[256] The fact that the composition of Congress and the White House, and therefore the EEOC commissioners, changes from election to election exacerbates these problems of "money and politics."[257] The EEOC field offices, however, typically are staffed by career civil servants.[258] This dynamic presents the possibility, and often the reality, that the EEOC field offices would choose to pursue cases that the EEOC commissioners in Washington, DC would drop.[259] The realization that the commissioner's charge process may be tainted by politics underscores the Seventh Circuit's concern that they are not a viable replacement for regular charge processing in the field offices, which are more insulated from such influences.

The possibility of intervening in an individual lawsuit is similarly constraining. The EEOC does not have a right to intervene; it can do so only at the discretion of the court.[260] In addition to undermining Title VII's goal of resolving employment discrimination suits out of court, requiring the EEOC to intervene, rather than allowing it to continue its investigation, inserts the judiciary in the middle of antidiscrimination efforts that Title VII meant to place within the responsibility of the EEOC.[261] Even when courts allow the EEOC to intervene, its ability to gather information likely would be restrained by limitations on discovery not present when the EEOC conducts an investigation outside of court.[262]

Eliminating the EEOC's authority to investigate after it issues a right-to-sue notice risks placing a serious restraint on the agency's ability to police discriminatory employment practices. The issue explored in this Comment appears to have emerged infrequently, but that could simply reflect a lack of reporting or a lack of appeals. More concerning, the frequency could increase dramatically if the Fifth Circuit's approach became the law of the land. If that were to happen, it would force the EEOC to rely on the alternatives touted in *Hearst* and would insert politics and procedural speedbumps into the process, placing additional hurdles in the way of an already resource-strapped agency.[263] As the Seventh Circuit held, "[T]he availability of alternate investigatory avenues hardly supports limiting the EEOC's use of its most effective avenue."[264] This statement is especially true here because the alternatives "could undermine the full investigatory authority of the EEOC."[265]

# Conclusion                                                                    TOP ↑

The EEOC's ability to investigate claims of discrimination is fundamental to the federal government's scheme to eliminate employment discrimination. Although concerns about ensuring swift resolution of charges and preventing a mountainous backlog of cases are legitimate, placing more limits on an already restricted agency seems a curious, and likely ineffective, solution. The better route, and the one adopted by the EEOC, is to maximize the EEOC's investigatory authority within the bounds of Title VII.

The EEOC's interpretation of its investigatory powers, as enshrined in § 1601.28(a)(3), is a valid exercise of the procedural rulemaking authority Congress granted. Therefore, the EEOC is entitled to deference from the judiciary. Although courts often have been skeptical of EEOC regulations, their hostility largely has been confined to the EEOC's attempts to issue substantive regulations. By contrast, the Supreme Court has upheld the legality of EEOC procedural regulations in several cases. Recognizing the validity of § 1601.28(a)(3)— indeed, awarding it the full measure of *Chevron* deference that it deserves—is neither a major shift in precedent nor policy. Rather, the result this Comment advocates affirms decades of practice, comports with the courts' generally broad view of EEOC enforcement powers, and enables the agency to carry out the vital antidiscrimination mission it has been tasked to accomplish.