# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYVANIA

| | |
|---|---|
| RENEE ZINSKY,  )<br>  )<br>    Plaintiff,  )<br>  )<br>  v.  )<br>  )<br> MICHAEL RUSSIN, RUSSIN FINANCIAL,  )<br> RUSSIN GROUP, SIMON ARIAS III,  )<br> ARIAS AGENCIES, S.A. HOLDINGS, LLC  )<br> and AMERICAN INCOME LIFE  )<br> INSURANCE COMPANY,  )<br>  )<br>    Defendants | 2:22-CV-547<br><br>Judge Marilyn J. Horan<br><br><br>**PETITION TO ENFORCE SETTLEMENT**<br><br>FILED ON BEHALF OF:<br><br>Defendants<br><br>Michael Russin, Russin Financial, and Russin Group<br><br>Matthew D. Gailey, Esquire<br>Pa. ID No. 90920<br>mgailey@cozzalaw.com<br>400 Holiday Drive,<br>Suite 210<br>Pittsburgh, PA 15220 |

1

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYVANIA

| | |
|---|---|
| RENEE ZINSKY, ) | 2:22-CV-547 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Judge Marilyn J. Horan |
| MICHAEL RUSSIN, RUSSIN FINANCIAL, ) | |
| RUSSIN GROUP, SIMON ARIAS III, ) | |
| ARIAS AGENCIES, S.A. HOLDINGS, LLC ) | |
| and AMERICAN INCOME LIFE ) | |
| INSURANCE COMPANY, ) | |
| Defendants | |

## PETITION TO ENFORCE SETTLEMENT

AND NOW, comes the Defendants, Michael Russin, Russin Financial, and Russin Group, hereinafter "Russin Defendants", by and through their attorneys, Cozza Law Group, and files the following Petition to Enforce Settlement averring as follows:

1. This matter stems from a federal lawsuit filed in the Western District of Pennsylvania Against the Russin Defendants et al.

2. The claims of Plaintiff Renee Zinsky, hereinafter "Plaintiff" against Defendant Arias and Defendant American Income Life Insurance Company were transferred to arbitration for the American Arbitration Association.

3. Plaintiff and Russin Defendants entered into a settlement agreement whereby in exchange for the testimony of Michael Russin at an Arbitration hearing, Plaintiff would dismiss the lawsuit in its entirety within 30 days of the conclusion of the Arbitration Hearing against Defendant American Income Life Insurance Company and Defendant Arias. (Please see the Settlement Agreement attached hereto as Exhibit 1.

4. As this Court is aware, the final order of the arbitrators was dated March 4, 2024 as it

2

was adopted and confirmed by this Court on April 3, 2024.

5. More than thirty (30) days have passed since the arbitration in this matter and Plaintiff has not yet dismissed the lawsuit in its entirety against the Russin Defendants.

6. Based on the preceding, Russin Defendants requests that this Honorable Court enforce the Settlement Agreement attached hereto as Exhibit 1 and dismiss the lawsuit against the Russin Defendants with prejudice.

WHEREFORE, the Russin Defendants request that this Honorable Court dismiss the lawsuit against the Russin Defendants with prejudice along with attorney fees, costs, and any other relief that this Honorable Court deems appropriate.

Dated: April 16, 2023              Respectfully submitted,

                                   COZZA LAW GROUP, PLLC

                                   Matthew D. Gailey, Esquire
                                   Pa. ID No. 90920
                                   mgailey@cozzalaw.com
                                   400 Holiday Drive, Suite 210
                                   Pittsburgh, PA 15220
                                   (412) 294-8444

                                   *Counsel for Defendants Michael Russin, Russin Financial, and Russin Group*

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYVANIA

| | | |
|---|---|---|
| RENEE ZINSKY, | ) | 2:22-CV-547 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Marilyn J. Horan |
| MICHAEL RUSSIN, RUSSIN FINANCIAL, | ) | |
| RUSSIN GROUP, SIMON ARIAS III, | ) | |
| ARIAS AGENCIES, S.A. HOLDINGS, LLC | ) | |
| and AMERICAN INCOME LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | | |
| Defendants | | |

## ORDER OF COURT

AND NOW, it is hereby ORDERED, ADJUDGED, and DECREED, that the Petition to Enforce Settlement is GRANTED. Furthermore, the lawsuit at 2:22-cv-547 filed by Plaintiff against Defendants Michael Russin, Russin Financial, and the Russin Group LLC, is hereby dismissed with prejudice.

Date:_____

_____
J.

4

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "**Agreement**") is agreed to and entered into effective September 6, 2023 (the "**Effective Date**") by and between Michael Russin, an adult individual ("**Russin**"), The Russin Group, LLC, a Pennsylvania limited liability company, and any other company under majority ownership, control, or management by Michael Russin (together, "**Russin Parties**") and Renee Zinsky ("**Zinsky**"). Russin Parties and Zinsky are sometimes collectively referred to as the "**Parties**" and individually as "**Party**".

## RECITALS

WHEREAS, Zinsky filed a federal lawsuit in the Western District of Pennsylvania against the Russin Parties and Simon Arias, Arias Agencies (together "**Arias**"), and American Income Life Insurance Companies ("**AIL**"), at docket number 2:22-cv-547 (the "**Lawsuit**");

WHEREAS, Zinsky's claims against Arias and AIL were transferred to arbitration before the American Arbitration Association ("**AAA**") (the "**Arbitration Hearing**");

WHEREAS, Russin Parties deny liability for all of Zinsky's claims filed in the Lawsuit;

WHEREAS, Zinsky seeks to obtain Russin's truthful testimony regarding his recollection of his time as an agent with AIL for use in her AAA case against Arias and AIL;

WHEREAS, the Parties desire to compromise and settle any disputes, satisfy any and all judgments and/or liens, avoid further litigation, and put to rest all controversy between them and provide each other with mutual releases.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises set forth in this Agreement, and other good and valuable consideration, the sufficiency of which the Parties acknowledge, the Parties agree as follows:

1. **Settlement.** In consideration for the execution of this Agreement, the Parties agree to the following:

    a. Russin shall testify truthfully about his tenure at AIL as set forth more fully in Exhibit A, to the extent he has personal knowledge regarding the same, in both a deposition and the Arbitration Hearing, if necessary, such necessity as determined by the Plaintiff (the "**Testimony**"); and

    b. Zinsky shall dismiss the Lawsuit against the Russin Parties (and the improperly named party, Russin Financial), in its entirety, and with prejudice, within thirty (30) days of the conclusion of the Arbitration Hearing against AIL and Simon Arias (the "**Dismissal**"); or

    c. If an appeal is taken regarding AIL, Arias Agencies, and/or Simon Arias, then Russin Parties Shall receive a dismissal from said Lawsuit within thirty (30) days.

    d. Should this matter ultimately result in a trial in federal court against AIL, Arias Agencies, and/or Simon Arias, Zinksy shall be permitted to use the Testimony in the federal court case; if Zinsky is specifically precluded from using Testimony in the federal court case by order of court, Russin agrees to testify consistent with this agreement in federal court.

Exhibit 1

The Dismissal shall not be conditioned upon the outcome of the Arbitration Hearing against AIL and Simon Arias or against any other third party.

Any disagreement between the Parties as to the quality of the Testimony shall be dispositively resolved by the Mediator appointed in the Lawsuit, David White. Such neutral third party shall review the transcript of the Testimony (and Arbitration Hearing, if necessary) and determine whether Russin testified reasonably consistently with the stipulated facts set forth in Exhibit "A" of this Agreement. For the avoidance of doubt, Zinsky agrees that Russin need not testify verbatim to the facts stipulated in Exhibit "A."

2. **Mutual Release.** Effective upon full execution of this Agreement, the Parties, on behalf of themselves, and all persons or entities claiming by, through or under them, and their respective heirs, successors, and assigns, to the maximum extent permitted by law, hereby fully, completely, and finally waive, irrevocably and unconditionally release, remise, acquit, and forever discharge and covenant not to sue the other Parties, as well as the other Parties' respective past or present members, owners, officers, directors, shareholders, trustees, parent companies, sister companies, affiliates, subsidiaries, employers, attorneys, accountants, predecessors, successors, insurers, representatives, agents, and any person or entity acting through or in concert with any of the preceding person or entities (the "**Released Parties**") with respect to any and all claims, demands, suits, manner of obligation, debt, liability, tort, covenant, contract, joinders, cross-claims, claims for attorneys' fees, or causes of action of any kind whatsoever, from the beginning of time to the date of this Agreement, known or unknown, asserted or unasserted, at law or in equity, including without limitation, all claims and causes of action arising out of or in any way relating to the Lawsuit. The Parties warrant and represent that they have not assigned or otherwise transferred any claim or cause of action released by this Agreement.

3. **Joint-Tortfeasor's Release.** It is understood and agreed by and between the Parties that this Agreement is executed pursuant to the provisions of the Uniform Contribution Among Joint Tortfeasors Act and/or the Pennsylvania Comparative Negligence Act. It is the intention of the Parties in this Agreement that it will conform in all respects to the Uniform Contribution Among Joint Tortfeasors Act and the Comparative Negligence Act.

It is further understood and agreed by and between the Parties that Zinsky is not releasing her rights or causes of action against any other persons or parties other than the Parties named in this Agreement arising out of the facts set forth in the Lawsuit. Zinsky expressly reserves the right to make claims against other persons and/or entities and make claims that these other persons and/or entities and not the Russin Parties are liable to her for the injuries, conditions, and damages sustained by the Zinsky and described in the Lawsuit.

In the event that other persons or tortfeasors are found to be jointly liable with the Russin Parties, for any damages as a result of the facts set forth in the Lawsuit, then the execution of this Agreement will operate as a reduction and satisfaction of the claims of Zinsky for the recovery of damages against those other persons or tortfeasors to the extent of the relative proportional/percentage share of liability found against Russin Parties, if any of those parties are found jointly liable with such other persons or tortfeasors. Zinsky further agrees that any verdict or award rendered against these other parties and/or entities will be reduced by the relative proportional/percentage share of Russin Parties, and any judgment entered on the verdict or award will be in the amount of the verdict or award reduced by



the relative proportional/percentage share of Russin Parties, irrespective of the basis of the finding of joint liability and even though such other parties and/or entities have not in fact been made a party hereto. Nevertheless, this provision in no way constitutes an admission of liability by Russin Parties.

It is expressly understood by and between the Parties that by execution of this Agreement, Russin Parties are not required to make any payments to Zinsky or to any persons and/or entities on behalf of Zinsky by reason of the facts and damages set forth in the Lawsuit, regardless of any verdict or award entered in favor of Zinsky in relation to the Arbitration Hearing.

Nothing in this Agreement shall act as a Release as to AIL, Globe Life, Arias Agencies, or Simon Arias.

4. **Mutual Non-Disparagement.** The Parties agree that they will not in any way disparage,r threaten, or harass the other Party, its agents, representatives, heirs, employees, customers, or partners, or make or solicit any comments, statements, or the like to the media on social media, or to any other person(s), including any statements against the other Party or its employees, members, managers, customers, or partners, that may be considered to be negative, derogatory, or detrimental to the quality, integrity, business practices, services, good name, or reputation of the other Party, its employees, members, manager, customers, or partners directly, or indirectly. The obligations contained in this Section 4 shall not apply to any statements or testimony before any court or agency of competent jurisdiction. The Parties agree not to publish any new statements about one another, but Section 4 excludes past statements, and third-party statements, made by others. This section applies to Zinsky and Russin Parties, and is not applicable the parties in AAA arbitration (i.e., AIL, Globe Life, Arias Agencies, and Simon Arias).

5. **No Admission of Liability.** It is expressly understood that this Agreement and the settlement it represents are entered into solely for the purpose of allowing the Parties to avoid any need for further legal involvement. This Agreement does not constitute an admission by either Party of any wrongdoing, contractual obligation, or of any duty whatsoever, whether based in statute, regulation, common law, or otherwise, and each Party expressly denies that any liability or any such violation has occurred.

6. **Confidentiality.** The terms and conditions of this Agreement are absolutely confidential between the Parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Any disclosure in violation of this section shall be deemed a material breach of this Agreement. The Parties are aware of the AAA case with AIL, Simon Arias, and Arias Agencies. As this Agreement is in settlement of the federal court claims against Russin Parties, and is not part of the AAA arbitration, this Agreement shall not be produced in the AAA arbitration. This Agreement will only be produced in federal court following an order of Court from Judge Horan, requiring production of this Agreement.

7. **Binding Effect.** This Agreement is binding upon the Parties, and their agents, servants, employees, shareholder, partners, attorneys, heirs, administrators, personal representatives, successors, and assigns.

8. **Entire Agreement.** This Agreement contains the entire agreement between the Parties regarding the subject matter of this Agreement, and there are no other agreements, promises



or representations, whether oral, written, express or implied, between the Parties not expressly set forth in this agreement, regarding the subject matter of this Agreement. The Parties also agree that all the terms of this Agreement are contractual and not a mere recital. It is understood that any breach of this Agreement shall constitute a separate and distinct cause of Action, unrelated to the Lawsuit.

9. **Modification and Waiver.** This Agreement may be modified only by a writing signed by both Parties.

10. **Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, notwithstanding its choice of law provisions. The Parties agree that any claims or legal actions by one Party against the other to enforce the terms of this Agreement or concerning any rights under this Agreement shall be commenced and maintained in any state court located in the Commonwealth of Pennsylvania, Allegheny County.

11. **Severability**. Each provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

12. **Counterparts.** This Agreement may be executed by the Parties in counterparts, which taken together, are deemed one and the same instrument.

**[SIGNATURE PAGE TO FOLLOW]**



IN WITNESS WHEREOF, the Parties, intending to be legally bound hereby, caused this Agreement to be executed as of the day and year as set forth above:

**RUSSIN DEFENDANTS:**

**RUSSIN:**

*Renee Zinsky by JRK*

_____  
MICHAEL RUSSIN

RENEE ZINSKY*

**RUSSIN FINANCIAL:**

By: _____  
Name: Michael Russin

*RENEE ZINSKY WAS OUT OF TOWN AT THE TIME THIS AGREEMENT WAS SIGNED. SHE PROVIDED AUTHORIZATION TO JOHN R. KANE, ESQUIRE THAT HE WAS AUTHORIZED TO SIGN HER NAME TO THIS AGREEMENT. SHE AGREES TO BE BOUND BY THIS AGREEMENT.

**RUSSIN GROUP, LLC:**

RUSSIN GROUP, LLC, a  
Pennsylvania limited liability company

By: _____  
Name: Michael Russin  
Title: Member

**ZINSKY:**

# EXHIBIT A

1. Russin worked for AIL and Arias Agencies ("Arias") from approximately November 2013 through February 28, 2022.

2. During the recruiting process, representatives of AIL made various representations to Russin, and other agents, such as:

   a. the ability to earn a six-figure income as of his first year as a sales agent;

   b. the ability to make his own schedule and control his own work as an independent contractor on behalf of AIL;

   c. Providing all AIL sales agents with ample sales leads at no cost;

   d. the ability to be an "entrepreneur" by owning and building his own business as an independent contractor on behalf of AIL; and

   e. the ability to bank renewal checks for compounded work and be able to retire from the business after the tenth work anniversary.

3. Soon after Russin signed his first agent contract with AIL, he discovered that AIL controlled virtually all aspects of his work including but not limited to his schedule, his hours, his attendance at mandatory meetings, the manner in which he performed his day-to-day duties as a sales agent on behalf of AIL, and his inability to operate his own business on his own terms. For example:

   a. Russin was often required to work 12-14 hour days, 6 to 7 days per week during his training period by AIL;

   b. AIL never compensated Russin for the time he worked as a trainee;

   c. Russin was often required by AIL to work 12-14 hour days, 6 to 7 days per week as a sales agent;

   d. Russin was not compensated for any overtime hours worked in excess of 40 hours per week as a sales agent;

e. Russin was required to incur business expenses such as gas, mileage, food, travel, lodging, etc. for which he was never reimbursed or otherwise compensated;

f. Russin was required to use certain sales scripts and rebuttals provided by AIL;

g. Russin was required to follow various protocols and practices required by AIL while performing his work as a sales agent including customer interactions both for in person and virtual sales;

h. Russin was required to attend certain meetings and work events as an AIL sales agent;

i. As a manager, Russin was required to pay certain "management fees" and otherwise financially contribute to agency contests on a monthly basis;

j. AIL mandated and required agents to attend meetings in person;

k. During the pandemic, the mandated/required meetings were held via Zoom. It was well known that failure to attend could have resulted in termination of the agent's contract;

l. Agents had no flexibility or authority to use advertising material referencing AIL products unless it is provided and approved by AIL. Under the contract, agents have the right to use AIL trademarks and copyrighted material in selling AIL products and only those materials;

m. Agents were given by AIL "will kits" and "child safety kits" for potential policy holders in order to solicit business; and

n. Agents were supplied, at no cost, health service discount cards, referral cards, business cards, and officer report forms.

o. Russin was aware of other agents in the Arias office that operated and worked in the same manner.

4. A significant part of the AIL business model involves sales leads ("Leads"). Leads. Leads were necessary in order to work as an AIL sales agent. Russin understood the following to be true and instructed his team regarding AIL Sales Leads:

  a. The Leads belong to AIL and are AIL trade secrets;

  b. At times, agents could pay for the Leads;

  c. Agents directly relied on Leads to earn income;

  d. An agent's ability to earn commissions or bonuses could be negatively impacted without new AIL Leads; and

  e. Russin understood that sales agents who did not hit certain sales metrics and/or attend certain meetings would be punished by having their AIL provided sales Leads reduced, withheld, or not provided at all.

5. A significant part of Russin's job was to recruit other agents to become agents. Russin made the following representations to his subordinate sales agents, with the express permission of both AIL and Arias:

  a. Agents were instructed to work early on the weekends, often beginning as early as 8:00 a.m., on Saturdays;

  b. Agents were instructed that appointments are set with a one-hour lead way. Agents are specifically told that after 2 or 3 fixed-time appointments, they must set a bridge to ensure the agent has a place to go;

  c. Russin represented to potential recruits that if they wanted to sell AIL products they would need to "work 65 hours a week" and "would have no days off or vacation for the first year";

  d. Russin represented to potential recruits that by the 3rd year they could potentially earn $500,000;

  e. Russin represented to recruits that if they continued to work for Arias for 3 years Arias would finance an exotic car payment;

  f. Russin represented to potential recruits that AIL has a "commission and bonus package [that] provides a high income immediately with a lifetime renewal contract for ensuring future wealth";

  g. When recruiting, Russin was not required to research the educational background of potential agents. His goal when recruiting was to verify that a recruit secured an insurance license, regardless of background;

h. If a potential recruit responded to an ad, the recruit would get a form email "congratulating" him or her that they were being considered for an interview;

i. Arias expected that after training, an agent would have 30 appointments a week, 15 presentations a week, and $2,000 ALP (minimum) submitted every week;

j. AIL expected strict compliance with certain schedules, including: paperwork was to be turned in on a designated submission day; leads had to be coded every day; Monday meetings were from 8 a.m. to 2 p.m.; no non-business sites were permitted to be accessed on any computer; business attire was required to be worn in the office during business hours, such as when formal interviews were being conducted;

k. AIL sales agents' income was directly related to the agents' volume of new recruits, new hires, and/or subordinate agents. For example, an agent in a management role such as Supervising Agent, General Agent, Master General Agent, and Regional Agent has higher commission structures than non-managerial agents such as career agents;

l. The larger an agents' team (of subordinate agents), the higher the agents' earning potential;

m. It was understood that agents who didn't meet certain performance requirements, hit certain sales quotas, and/or attend certain meetings may have their subordinates removed from their team and coded under another agent, which may have a direct negative effect on an agent's income;

n. Russin's subordinate sales agents were expected to comply with all of the above-mentioned requirements discussed in paragraph 3 as AIL sales agents, as well; and

o. Agents were trained to schedule 5 to 7 door knocks every day.

6. Agents were made aware of the company hierarchy and were informed that they worked for AIL and were instructed to represent to customers that they worked for AIL.

7. All agents, including Zinsky, were required to participate in AIL and Arias training programs.

8. Agents were instructed on "AIL concepts and philosophy" and had to be familiar with AIL sales scripts.

9. AIL agents used the sales scripts attached hereto as Annex 1 (Bates 1720) and Annex 2 (Bates 1721).

10. AIL and Arias had the authority to discipline agents and terminate their contracts, including Renee Zinsky and Michael Russin.

11. Russin witnessed other AIL agents behave inappropriately toward subordinate female agent in the following manner:

   a. Openly making comments about females agents, including regarding their physical appearance in a sexualized manner;

   b. Use of derogatory terms in general but to include "bitches" "sluts" and "whores";

   c. Agents publicly discussing sexual encounters with other agents; and

   d. Callouts that included humiliating or offensive behavior such as hair removal, getting tattoos, and consuming alcohol.

12. Russin is aware of a video, showing Zinsky humping another agent. Russin was not present for this video, and thus, he does not know if this was a callout, due to her failure to meet a goal and/or quota.

13. AIL and Globe Life have consistently recognized Arias with numerous awards and accolades. Russin viewed this as recognition that Arias was operated as AIL intended.

14. AIL leaders such as Steve Greer and David Zophin frequently visited the office that Russin worked out of, participated in calls and meetings, and attended other offsite work events (dinners, convention, speaking engagements, social outings) with the AIL agents. AIL leaders must have been aware of the culture in the Arias office, and did not object to Russin.

15. To Russin's knowledge, AIL was aware of the following:

Unwelcomed sexual comments toward subordinate female agents

    a. Russin engaged in and witnessed alcohol and drug use by sales agents at Arias during the course and scope of the typical workday;

    b. AIL managers and business leaders used language that could be seen as discriminatory, lewd, and offensive in the work environment;

    c. AIL managers and business leaders behaved in a manner that could be seen as lewd and offensive in the work environment;

    d. AIL and Arias' managers and business leaders also behave in a manner that would be seen as lewd and offensive in a normal work environment;

    e. Russin witnessed footage of a colleague physically assault another agent by throwing him through a door;

    f. AIL managers and business leaders would frequently host work-related events at bars and nightclubs;

    g. AIL managers and business leaders would use threats against subordinate agents;

    h. When agents separated from Arias/AIL, the managers would typically make disparaging and/or defamatory comments about their former agents;

    i. AIL managers and business leaders discouraged subordinate agents from retaining legal counsel and/or initiating legal claims against AIL; and

    j.

    k. Leaders would withhold Leads as a disciplinary measure;

    l. Leaders would remove subordinate agents as a disciplinary measure; and

    m. All AIL applications had to be reviewed and approved by AIL.

16. Zinsky reported her allegations against Russin in August 2021. Russin had no concerns that he would face discipline and was not concerned that he might lose his job over Zinsky's allegations.

17. Russin was surprised that AIL disciplined him as a result of Zinsky's allegations.

18. Russin is aware of instances in which AIL agents in the Arias office, not on or coded to Russin's team, may have performed unethical and/or fraudulent sales practices, including the following:

   a. Agents paying for policies from their own pockets;
   b. Taking confidential information from CAS to write new policies; and
   c. The use of automatic dialers, third-party dialers, and roto dialers were likely used at times due to the emails that Russin recalls, discouraging agents from their use; ; and
   d. AIL urged agents not to document the aforementioned behavior in writing.

19. Russin is not aware of any instances in which Arias's policies for sexual harassment, drugs and alcohol, and insurance fraud were enforced.

20. While Russin received some initial AIL HR training when he was hired in 2013, he remembers very little of the information provided and since his initial hiring, he saw no further involvement from AIL HR. No AIL HR information of any kind was posted anywhere at Arias. AIL never provided Russin or his coworkers with benefits and resources made available by the OPEIU union to the agents/members.

21. To the best of Russin's knowledge:

   a. Agents were not given a choice on whether they joined the union -- all AIL agents automatically become OPEIU Local 277 union members;
   b. Russin never had contact with anyone from the union;
   c. Russin had no knowledge of any union procedures;
   d. Russin never saw any union signs at the Wexford office;



   e.  Russin never heard of or saw a copy of the Collective Bargaining Agreement between AIL/Arias and the OPEIU;

   f.  Russin was never made aware of any OPEIU policies including but not limited to the sexual harassment policy, and/or labor laws;

   g.  Generally, AIL agents had no authority to meet with unions, credit unions, and/or other organizations to garner leads on their own;

   h.  Russin was never made aware of any OPIEU processes and procedures such as the grievance process; and

   i.  Russin was never made aware of any OPEIU representatives or contact information for any OPEIU representatives.

22.  Since February 2022, Russin has been affiliated with and is a member of a staffing agency that provides leads to insurance agents who work for AIL, among other companies.

   a.  Since February 28, 2022, AIL agents have paid that staffing company for recruiting services, i.e. recruiting/hiring new sales agents on behalf of AIL, in lieu of performing those recruiting duties themselves;

   b.  Per the terms of his separations with AIL, Russin (and companies he may work for) is not restrained from performing ancillary services for AIL agents; and

   c.  Russin was told by AIL that he was being terminated because "our/AIL values do not align" (see previous testimony p. 250).

23.  Russin was involved in the decision to hire Zinsky. When meeting with Zinsky,

   a.  Russin's team presented the AIL agent contract to Zinsky for her signature;

   b.  Russin did not discuss with Zinsky each and every paragraph of the AIL agent contract;

   c.  Russin represented that once Zinsky signed the contract she would be provided with material to assist her in passing the insurance exam;

   d.  Russin explained to Zinsky that she would be working for Arias and AIL;

K

e. Russin never represented to Zinsky that by signing the agent contract she automatically became a member of the OPEIU local 227;

f. Russin advised Zinsky before she signed the agent contract that she was unable to sell insurance for any other entity other than AIL while she was an AIL agent;

g. Russin never explained to Zinsky that AIL may pay her commissions before they were earned and that AIL would charge her interest and fees on advance commission;

h. Russin never represented to Zinsky before she signed the agent contract that she had to maintain a separate office;

i. Russin instead advised Zinsky that she would transact AIL business at Arias' Wexford office;

j. The required meetings/presentations were held in the Arias office;

k. Zinksy, and other agents, were ordered to be at work by a certain time every day, and she could be disciplined if she did not spend 12 hours in the office each day;

l. The position Renee Zinsky held did not require any industry specific skills. After hiring Zinsky, Russin became was aware that Renee Zinsky was only a high school graduate, with a diagnose ADHD condition; Russin knew that when Zinsky was in high school she took classes in a "Resource Room"; Renee tried to take classes at Community College, but could not function in that setting due to ADHD;

m. Renee's employment history – pizza shop, Amazon driver, pharmacy clerk, nanny was irrelevant to her job at AIL;

n. No AIL agent was free to choose the manner in which services were performed; the job is scripted by AIL and enforced by Arias;

o. Generally, AIL agents were required to purchase AIL products;

p. Renee disclosed to Russin in 2021 that "[her] anxiety [had] impacted her work and life in general and [she was] taking time to get [herself] back on track"; and



    q. Managers, including Russin, were portrayed and maintained a certain personal and financial lifestyle. This was to further advertise for the success of the organization and draw in more recruits.

22. Russin is aware that the culture at Arias Agencies has been described, fairly, as cult-like.